# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1641

NAVREET NANDA,

*Plaintiff-Appellee,*

v.

GERALD MOSS,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 00 C 4757—**Rebecca R. Pallmeyer**, *Judge.*

———————

ARGUED SEPTEMBER 14, 2004—DECIDED JUNE 27, 2005

———————


Before CUDAHY, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Dr. Navreet Nanda sued the
Board of Trustees of the University of Illinois and five other
University officials for discrimination and violation of her
constitutional rights. Dean Gerald Moss, M.D., now appeals
the district court's decision to deny him qualified immunity
and argues that he is entitled to qualified immunity
because his conduct did not constitute a violation of Dr.
Nanda's constitutional rights, and because it was not
clearly established that Dean Moss's concurrence with Dr.
Nanda's termination violated her equal protection rights.
We disagree and affirm the district court's decision to deny
Dean Moss qualified immunity.

## I. BACKGROUND[1]

Dr. Nanda, a woman of Asian and Indian descent, accepted a tenure track position with the University on May 20, 1996, as an Assistant Professor in the Department of Microbiology and Immunology (the "Department") within the College of Medicine located in Chicago, Illinois. The Dean of the College of Medicine, Dean Moss, both approved Dr. Nanda's area of research and determined that Dr. Nanda's research was in line with needs of the Department.

In February 1997, Dean Moss appointed Dr. Prabhakar Head of the Department, and Dr. Nanda claims that her problems at the University began with his appointment. According to Dr. Nanda, Dr. Prabhakar: (1) usurped her assigned and promised lab space, with the assistance of Dean Moss who ultimately gave Dr. Prabhakar permission to take over the promised space; (2) denied Dr. Nanda alternative lab space and equipment commensurate with her research needs; (3) refused to endorse or attend Dr. Nanda's student-faculty scholarship group whereas he attended and endorsed similar groups organized by male faculty members; (4) refused to allow Dr. Nanda to teach any course during her final year of employment; and (5) encouraged students not to work with Dr. Nanda during her final year.

Sometime before July 1, 1998, Dr. Prabhakar called a meeting with Dean Moss and members of Dean Moss's staff to discuss the propriety of, and procedure for, issuing a contract termination for Dr. Nanda. As an Assistant Professor, Dr. Nanda could receive a written "notice of

---

[1] When deciding whether a public official is entitled to qualified immunity, we simply assume the disputed facts in the light most favorable to the plaintiff, and then decide, under those facts, whether the defendant violated any of the plaintiff's clearly established constitutional rights. *Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005) (quotes and citations omitted).

nonreappointment," or a "terminal contract" from the University at any time prior to the last year of her appointment. The common practice at the University was for the Dean or Department Head to seek the advice of the advisory committee or other appropriate committee before termination, and the Dean of Faculty Affairs, Kathy Hart, advised Dr. Prabhakar that he needed to solicit input from the Faculty Advisory Committee before making such a recommendation.

However, on July 1, without seeking the advice of the Faculty Advisory Committee, Dr. Prabhakar recommended to Dean Moss that Dr. Nanda receive a terminal contract which would end her employment with the University effective August 31, 1999. We note that Dr. Nanda was the first Assistant Professor on the tenure track to receive a terminal contract without prior input from the Faculty Advisory Committee.

### A. Dean Moss's Role

It is undisputed that Dean Moss personally never saw Dr. Prabhakar engage in any of the discriminatory acts alleged by Dr. Nanda. Dr. Prabhakar, however, could not have fired Dr. Nanda without Dean Moss's approval. As a result, Dean Moss is at the center of the controversy surrounding Dr. Prabhakar's recommendation as the only person in position to ensure the propriety of Dr. Prabhakar's recommendation and with the authority to reject Dr. Prabhakar's recommendation if there was evidence of impropriety.

On July 7, 1998, several faculty members sent a letter to Dr. Prabhakar challenging his decision to recommend a terminal contract for Dr. Nanda. The letter asserted that "no substantive scientific or academic grounds for [his] decision [existed]," and suggested that "[g]iven the context of the personality differences between you and Dr. Nanda, this dismissal could be construed as a gender based action."

The faculty members further stated that "[t]he absence of a stated cause for this action suggests that no clear justification can be made."

Around July 10, 1998, Dean Moss met with a subset of the authorship who told Dean Moss directly that they believed the terminal contract was unjust and perhaps based on Dr. Nanda's gender. Dean Moss reportedly conceded in this meeting that he knew it was wrong to issue Dr. Nanda a terminal contract without prior faculty input, nonetheless he urged Dr. Nanda's colleagues to support the decision.

On July 10, 1998, Dr. Nanda sent a letter to Vice Dean Charles Rice, M.D., with a copy sent to Dean Moss, disputing her termination and stating her strong belief that "a significant part of [the] decision [to terminate my employment] is based on gender related issues and factors." Around this same time, Dr. Nanda met with Dean Moss and reiterated these sentiments, as well as her belief that ethnicity was also a factor in the terminal contract decision.

On July 13, 1998, Dr. Nanda wrote to the Academic Freedom and Tenure Committee of the UIC Faculty Senate ("AFTC"), asserting that the terminal contract constituted a denial of her right to academic freedom, and copies of the letter were sent to Dean Moss and Dr. Prabhakar. On July 24, 1998, the chairman of the AFTC, Dr. Eugene F. Woods, met with Dr. Prabhakar and asked him the reason for his terminal contract recommendation. According to Dr. Woods, Dr. Prabhakar first stated that there was no reason for his recommendation, but then said he wanted to take the Department in a new research direction.

On July 24, 1998, Dr. Prabhakar met with the Department faculty concerning Dr. Nanda's termination. According to minutes from the meeting, Dr. Prabhakar acknowledged that he made the decision to recommend a terminal contract for Dr. Nanda "unilaterally," explaining that he chose not to seek approval from the Faculty Advi-

sory Committee because he believed that the committee would not agree with his recommendation. One week later on July 31, 1998, the Faculty Advisory Committee sent Dr. Prabhakar a memorandum asking him to reverse the terminal contract recommendation.

Around this same time, Dr. Woods met with Dean Moss to discuss Dr. Nanda's terminal contract recommendation. According to Dr. Woods, Dean Moss first told him that he had been advised by counsel not to give Dr. Nanda a reason for the terminal contract, but then told Dr. Woods that her research did not fit Dr. Prabhakar's vision for the Department. Ultimately, the AFTC concluded that Dr. Nanda's terminal contract had been issued without due process and constituted a denial of her academic freedom. In the AFTC's view, contrary to Dr. Prabhakar's assessment, Dr. Nanda's research was an excellent fit for the direction of the Department.

Dean Moss also had knowledge, during this time, of another woman in the Department, Dr. Amy Kenter who, similar to Dr. Nanda, was experiencing problems with Dr. Prabhakar.[2] On July 8, 1998, Dr. Kenter met with Dean Moss and advised him of the problems she was having with Dr. Prabhakar regarding her lab space. She also noted to Dean Moss that Dr. Nanda had similar problems with Dr. Prabhakar and suggested that gender may have played a role in his decision to issue Dr. Nanda a terminal contract. On July 21, 1998, Dr. Kenter made a formal harassment complaint to Dean Moss regarding her interactions with Dr. Prabhakar over lab issues. A week later on July 27, 1998, Dr. Kenter's attorney wrote to Dean Moss contending that Dr. Prabhakar had discriminated against Dr. Kenter on the

---

[2] Dr. Nanda and Dr. Kenter were the only two active female research scientists in the Department.

basis of her gender. Nothing in the record indicates that Dean Moss did anything in response to Dr. Kenter's complaints.

Sometime between July 1 and August 31, 1998, Dean Moss informed the Provost, Elizabeth Hoffman, Ph.D., that Dr. Nanda should receive a terminal contract. Provost Hoffman only spoke about the terminal contract recommendation with Dean Moss, and testified in a deposition that Dean Moss told her that the faculty had met and voted to uphold the recommendation in August 1998.

### B. The University's Grievance Procedure

Provost Hoffman passed along Dean Moss's recommendation to Chancellor David Broski, who then passed it to President James Stukel, Ph.D. On August 31, 1998, the Board of Trustees accepted Dr. Prabhakar's recommendation and issued a terminal contract ending Dr. Nanda's employment with the University on August 31, 1999. Pursuant to the University's Grievance Procedures, Dr. Nanda filed a formal grievance demand with Dean Moss on September 11, 1998 challenging the terminal contract.

In the grievance, Dr. Nanda argued that Dr. Prabhakar failed to follow the required departmental process before issuing his recommendation, and that the recommendation was based on her gender and ethnicity. On October 2, 1998, pursuant to the University's Grievance Procedures, Dean Moss appointed Rochelle Cohen, Ph.D., then Professor and Interim Head of the Department of Anatomy and Cell Biology, to investigate Dr. Nanda's grievance. On October 26, 1998, Dr. Cohen issued her report to Dean Moss stating that she found no evidence of gender or ethnic discrimination by Dr. Prabhakar with respect to the terminal contract recommendation.

On October 29, 1998, Dean Moss denied Dr. Nanda's grievance, and on November 11, 1998, Dr. Nanda appealed

Dean Moss's decision to Provost Hoffman. Five days later, Provost Hoffman appointed Kathleen Knafl, Ph.D., Executive Associate Dean of the College of Nursing Administration, as the Hearing Officer to conduct a formal investigation into Dr. Nanda's grievance. Dr. Knafl ultimately concluded that although Dr. Prabhakar's failure to obtain advice from the Faculty Advisory Committee before recommending a terminal contract was "counter to the spirit" of the University statutes, the termination process was in keeping with the usual practice within the College of Medicine, and there was no compelling evidence to support Dr. Nanda's allegations of gender or ethnic discrimination. On April 29, 1999, Provost Hoffman informed Dr. Nanda of her decision to deny the grievance appeal.

Dr. Nanda appealed Provost Hoffman's decision to Chancellor Broski, which was denied June 9. Chancellor Broski reaffirmed Provost Hoffman's conclusion that Dr. Prabhakar's recommendation of a terminal contract was neither procedurally flawed nor discriminatory. Dr. Nanda then appealed Chancellor Broski's decision to President Stukel. In accordance with University statutes, President Stukel's review was limited to determining whether procedural requirements had been met and was not a review of the merits of the terminal contract recommendation. President Stukel informed Dr. Nanda that the grievance proceedings had been conducted in accordance with the University's established procedures, and that her appeal was denied. President Stukel nevertheless chose to extend Dr. Nanda's contract for one year until August 31, 2000.

After her termination, Dr. Nanda filed this case alleging her termination was in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and also alleging that Provost Hoffman, Chancellor Broski, President Stukel, Dean Moss, and Dr. Prabhakar in their individual capacities violated her equal protection rights under 42 U.S.C. § 1983. Defendants moved for summary

judgment, and the district court concluded that there was sufficient evidence in the pretrial record to create a genuine issue of material fact that Dr. Prabhakar violated Dr. Nanda's Fourteenth Amendment right to equal protection. The district court, therefore, denied summary judgment as to the University and Dr. Prabhakar, but granted summary judgment on qualified immunity grounds to Provost Elizabeth Hoffman, Ph.D., Chancellor David Broski, and President James Stukel, Ph.D. The district court also denied qualified immunity to Dean Moss and he now appeals the district court's ruling.

## II. ANALYSIS

Government officials performing discretionary functions are entitled to qualified immunity from suit unless their conduct violated "clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A district court's denial of a claim of qualified immunity, notwithstanding the absence of a final judgment, is immediately appealable as a final decision to the extent that the decision turns on an issue of law. *Board v. Farnham*, 394 F.3d 469, 476 (7th Cir. 2005). Thus, on appeal of the denial of qualified immunity, we do not review the district court's determination of whether the pretrial record sets forth sufficient evidence to create a disputed issue of material fact, but instead only review the legal determination of qualified immunity based on the pretrial record construed in a light most favorable to the non-moving party. *Id.*

We review the legal determination of a defendant's claim of qualified immunity *de novo*, *see id.* at 476-77 (citations omitted), and undertake a two-part analysis asking: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right"; and (2) whether the

right was clearly established at the time of its alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

In looking at the facts in a light most favorable to Dr. Nanda, we find that Dean Moss's conduct in facilitating and ratifying Dr. Prabhakar's recommendation to terminate Dr. Nanda constituted a violation of Dr. Nanda's constitutional rights, and that the contours of Dr. Nanda's constitutional right to be free from gender and ethnic discrimination in her workplace were clearly established in federal law at the time in question.

### A. Dean Moss's Alleged Conduct

On appeal, Dean Moss cites *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988), for the proposition that there is no principle of superiors' liability, either in tort law generally or in the law of constitutional torts, and argues that under *Jones* he is entitled to qualified immunity because, like his fellow supervisors, he never engaged in any conduct that violated Dr. Nanda's constitutional rights. Under § 1983, however, supervisory liability can be established if the conduct causing the constitutional deprivation occurs at the supervisor's direction or with the supervisor's knowledge and consent. *See id.* at 992-93 (finding that supervisor liability for constitutional torts will attach where a supervisor knows about the alleged conduct and facilitates it, approves it, condones it, or turns a blind eye for fear of what he or she might see). Since the facts as construed in a light most favorable to Dr. Nanda establish that Dr. Prabhakar could not have fired Dr. Nanda by himself, but instead needed the assistance of Dean Moss to facilitate Dr. Nanda's termination, Dean Moss would not be entitled to qualified immunity if the facts as construed in a light most favorable to Dr. Nanda establish that Dean Moss was deliberately indifferent in facilitating Dr. Prabhakar's discriminatory termination. *See Anderson v. Cornejo*, 355

F.3d 1021, 1026-27 (7th Cir. 2004) (holding that managers were entitled to qualified immunity absent evidence that the managers were deliberately indifferent toward complained of discrimination).

Dean Moss explains that his conduct was limited to merely supervising the bad actor, Dr. Prabhakar, and claims that in concurring with Dr. Prabhakar's recommendation "[a]ll he really knew in July and August of 1998 was that Prabhakar and Nanda had clashed over administrative matters such as lab space and teaching assignments." *See* Appellant's Opening Brief at 20. It appears, however, that Dean Moss had every reason to question Dr. Prabhakar's recommendation, but instead chose not to do so.

In looking at the facts in a light most favorable to Dr. Nanda, Dean Moss knew that Dr. Prabhakar had not sought the input from the Faculty Advisory Committee before making his recommendation to terminate Dr. Nanda. In addition, Dean Moss heard from several faculty members who both complained of Dr. Prabhakar's recommendation, and argued that Dr. Prabhakar's recommendation was based on Dr. Nanda's race, gender or ethnicity. Moreover, Dean Moss met with Dr. Kenter about the similar problems she was having with Dr. Prabhakar, before Dr. Kenter filed a formal complaint. Dr. Kenter's attorney also sent Dean Moss a letter dated July 27, 1998 contending that Dr. Prabhakar had discriminated against Dr. Kenter on the basis of her gender. Additionally, Dean Moss received copies of Dr. Nanda's letter to Vice Dean Rice disputing her termination on gender grounds, and a July 13, 1998 letter Dr. Nanda wrote to the AFTC asserting that the terminal contract constituted a denial of her right to academic freedom. Finally, Dean Moss knew that on July 31, 1998, the Faculty Advisory Committee sent Dr. Prabhakar a memorandum asking him to reverse the terminal contract recommendation because he failed to seek its input in making the recommendation.

In response to all of these events, Dean Moss chose to either discredit or completely ignore each of the complaints, concerns and allegations levied against Dr. Prabhakar and his recommendation to terminate Dr. Nanda. Indeed, if Dr. Nanda's version of the facts is accurate, then Dean Moss approved Dr. Prabhakar's recommendation and then falsely communicated to Provost Hoffman that the faculty had met and voted to uphold the recommendation.

In defending his role in ratifying and facilitating Dr. Nanda's termination, Dean Moss analogizes himself to the supervisor defendants in *Anderson* and argues that at worst he was merely negligent, but not deliberately indifferent, in failing to follow up on the complaints, concerns and allegations levied against Dr. Prabhakar.

In *Anderson*, the plaintiffs, 90 American citizens who were searched at O'Hare Airport, contended that United States Customs personnel chose them for non-routine searches because of their race and sex. 355 F.3d at 1022. In reversing the district court's denial of qualified immunity, this court held that in the case of one specific supervisor there was no evidence that the supervisor acted with deliberate indifference toward the complained-of discrimination where the supervisor in question was charged with reviewing the complaints of approximately 30,000 passengers selected for non-routine searches over the course of a year, and none of the complaints asserted the combination of race and sex discrimination alleged by plaintiffs. *Id.* at 1027.

In comparing himself to the defendants in *Anderson*, Dean Moss ignores the notice and opportunity he was afforded to prevent the violation of Dr. Nanda's constitutional rights including: (1) Dr. Nanda's complaints of discrimination; (2) the claims of senior faculty within the Department; (3) the independent investigation done by the AFTC; and (4) Dr. Kenter's simultaneous claims of similar treatment at

the hands of Dr. Prabhakar. In contrast, the supervisor defendant in *Anderson* never had any such notice or opportunity to investigate the alleged discrimination. *Id.* at 1026-27 (finding that there can be no deliberate indifference and therefore, no imputation of knowledge where there is no reason to think that a supervisor suspected that his subordinates were engaged in discrimination and then tried to shield them from guilt). As such, this court's ruling in *Anderson* does not help Dean Moss.

Dean Moss also attempts to insulate his behavior with the fact that he appointed a female department head from within the College of Medicine to investigate Dr. Nanda's claims of discrimination once Dr. Nanda filed a grievance challenging her termination. Dean Moss holds out the appointment of Dr. Cohen as a shield to demonstrate that he did not merely ratify Dr. Prabhakar's recommendation but that he investigated these claims and took her claims seriously.

In making this argument, Dean Moss focuses on the events subsequent to his ratification of Dr. Prabhakar's recommendation, but the correct focus of this appeal is Dean Moss's role in facilitating Dr. Nanda's termination between July 1, 1998, when Dean Moss received Dr. Prabhakar's recommendation, and August 31, 1998 when the Board of Trustees accepted President Stukel's recommendation to end Dr. Nanda's employment. Accordingly, Dean Moss's actions after the Board's acceptance are both too little and too late to qualify him for immunity from this suit. The facts as construed in favor of Dr. Nanda suggest that Dean Moss did not investigate Dr. Nanda's claims until he was told to investigate by Provost Hoffman, which was after Dean Moss had ratified the terminal contract recommendation, after he had already passed the recommendation on to Provost Hoffman, after the University set a termination date for Dr. Nanda, and after Dr. Nanda instituted her formal grievance. Dean Moss both ignored repeated complaints that Dr.

Prabhakar's terminal contract recommendation was motivated by gender and ethnic discrimination, and overlooked the fact that Dr. Prabhakar made the terminal contract recommendation without following proper process and procedure. Accordingly, the facts taken in the light most favorable to Dr. Nanda establish that Dean Moss was deliberately indifferent in facilitating Dr. Prabhakar's discriminatory termination, and therefore violated Dr. Nanda's constitutional rights.

### B.  Dr. Nanda's Clearly Established Rights

Having found that Dean Moss's alleged actions violated Dr. Nanda's constitutional rights, Dean Moss would still be entitled to qualified immunity if Dr. Nanda's constitutional rights at issue were not clearly established at the time of these events. It is the plaintiff's burden to demonstrate the existence of a clearly established constitutional right, *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994), but in determining whether a constitutional right has been clearly established, it is not necessary for the particular violation in question to have been previously held unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Instead, a clearly established constitutional right exists in the absence of precedent, where "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Additionally, where the constitutional violation is patently obvious, a plaintiff may not be required to present the court with any analogous cases, as widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated. *See Kernats*, 35 F.3d at 1176.

It has been plain in this circuit for quite some time that arbitrary gender-based discrimination, including discrimination in an educational setting, violates the equal protection clause. In 1986, we held that sexual harassment

constitutes sex discrimination in violation of the equal protection clause. *Bohen v. City of East Chicago, Indiana*, 799 F.2d 1180, 1185 (7th Cir. 1986). Later, in *Nabozny v. Podlesny*, 92 F.3d 446, 455 (7th Cir. 1996), we denied qualified immunity in a case claiming that school officials had violated the plaintiff's right to equal protection through gender discrimination. The *Nabozny* case, and the Supreme Court cases it relies upon, *Reed v. Reed*, 404 U.S. 71 (1971), *Weinberger v. Wiesenfeld*, 420 U.S. 636 (1975), and *Mississippi University for Women v. Hogan*, 458 U.S. 718 (1982) established the principle that schools are required to give male and female students equivalent levels of protection. *Nabozny*, 92 F.3d at 456.

Dean Moss argues that it was not clearly established in July and August 1998 that his concurrence with Dr. Prabhakar's recommendation would violate Dr. Nanda's civil rights. This argument, however, does not completely capture the extent of Dean Moss's conduct under scrutiny on this appeal. We find that a reasonable dean or university administrator was on notice as of 1998 that it would be a violation of federal law to ratify a recommendation to terminate a female professor without investigation into several allegations of gender and ethnic discrimination surrounding the recommendation, and then to falsely report that the recommendation was made with the approval of faculty and an advisory committee.

## CONCLUSION

For all the foregoing reasons, the decision of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*