In the

# United States Court of Appeals
### For the Seventh Circuit

No. 09-2920

SANDRA T.E., JANET ROE, MARCIELO G.,
SARA K., G. G., RUFUS E., DEBORAH K.,
LYNN A., MIKE A., ALICIA B., EMANUELE B.,
JUDITH B., GEORGE K., ELEVI S., RAYMOND S.,
C.E., T.A., R.A., JON ROE, JANE ROE,
and FRANCISCO G.,

*Plaintiff-Appellees,*

*v.*

KAREN GRINDLE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05-cv-473—**William J. Hibbler**, *Judge.*

ARGUED JANUARY 14, 2010—DECIDED MARCH 17, 2010

Before FLAUM, ROVNER, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. The appellant, Karen Grindle, was
principal of Pershing Elementary School at a time when
the school district's band teacher, Robert Sperlik, molested

several young girls there. Sperlik was arrested once his abuse came to light. Plaintiffs subsequently brought suit against Sperlik and Grindle, among others, alleging violation of 42 U.S.C. § 1983 on both equal protection and substantive due process theories. Grindle moved for summary judgment, claiming she was entitled to qualified immunity because plaintiffs had failed to establish a violation of a clearly established right. The district court denied her motion, and this appeal followed. Because the plaintiffs have put forth evidence which, if credited by the jury, is sufficient to create liability under the clearly established law of this circuit, we affirm.

## I. Background

In May 2001, three classmates, referred to as C.E., Jane Doe #2, and E.S., attended a seminar at their elementary school about inappropriate touching. After the presentation, they wrote a letter to the presenter. The text of the letter raised concerns about their band teacher, Sperlik. The text of the letter reads:

Dear Mrs. Fick,

[Jane Doe #2 and C.E.] have a band teacher named Mr. Sperlik. When we are in band we feel very uncomfortable because he does the following:

Rubs our legs sometimes; Rubs our back to feel for a bra if we mess up and says it's ok; comments [to] me [C.E.] about my hair and how nice it looks when it's down; comments [to] [Jane Doe #2] about how she

dresses [and] that she could be a model; there is another girl in our class and he doesn't do anything to her.

P.S. Please don't tell him we told you and if you do please don't mention any names!!! We're afraid to tell our parents!

The counselor forwarded this note to Grindle, who met with Sperlik and showed him a copy. Grindle then met with Jane Doe #2 individually. Jane Doe #2 and Grindle disagree about what took place during that meeting. Jane Doe #2 maintains that she told Grindle that Sperlik rubbed the girls' legs, touched them on their private areas through their clothes, and pulled against them, pressing his penis into their backs. Grindle claims Jane Doe #2 told her only that Sperlik would place his hand on her knee and make a tapping motion to keep the beat.

Shortly after meeting with Jane Doe #2, Grindle met with Jane Doe #2's parents. Grindle told the parents about the girls' letter, but refused to let them see it, instead telling them that their daughter had attended a "good touch, bad touch" seminar that had led her to overreact and write the letter. Grindle also told the parents that Sperlik had innocently touched their daughter on her shoulder and legs to help her keep time with the music.

Grindle spoke with C.E. the week after she met with Jane Doe #2. Grindle claims that C.E. only confirmed what was written in the letter and, like Jane Doe #2, only indicated that she had been tapped on the knee. C.E., however, maintains that she told Grindle that Sperlik would touch her private areas when he rubbed her back

and would also touch her breasts when he would stand behind her. When Grindle subsequently met with C.E.'s mother, Sandra T.E., she told her that C.E. had complained about Sperlik and demonstrated the touching as a tapping on the knee in order to keep the beat.

After meeting with the girls and their parents, Grindle spoke with the school's social worker, Nancy Ohalla. Grindle told Ohalla that the girls had complained about Sperlik touching their knees, but did not show Ohalla the letter.

At some point, Grindle authored an undated incident report about the girls' complaints. Grindle claims that she prepared this report at the direction of the school's director of human resources, Karen Uhren, but Uhren does not recall meeting with Grindle or telling her to write the report. In the report, Grindle describes Sperlik's conduct as she had described it to the parents. Grindle also wrote an undated memorandum to Sperlik, informing him of the complaints and advising him that the complaints could be considered sexual harassment. In the memorandum, Grindle directed Sperlik to avoid making physical contact with students and to refrain from comments regarding students' appearance.

In January 2002, Grindle received another complaint about Sperlik. A student, referred to as M.K., and her mother, Deborah K., met with Grindle to complain about Sperlik forcefully grabbing M.K.'s arm to restrain her. Grindle met with Sperlik and informed M.K. that Sperlik would no longer be allowed to teach with his classroom doors closed. Although this was the second complaint

against Sperlik in less than a year, Grindle did not alert any other school personnel to Sperlik's ongoing behavior.

The next incident occurred in April 2002. Grindle received an anonymous call from a parent who stated that her daughter felt uncomfortable when Sperlik put his fingers over hers while demonstrating proper fingering technique. Grindle informed the district's superintendent, William Jordan, about the call. Grindle also informed Jordan about the complaints made by Jane Doe #2 and C.E. the year before, but presented them as a "pedagogical issue" rather than potential sexual harassment. At Jordan's direction, Grindle met with Mary Lee Bocwinski, the district's director of curriculum. Grindle told Bocwinski that there had been an "incident" with Sperlik the previous year that had been resolved to everyone's satisfaction, but did not inform Bocwinski about the contents of the letter written by C.E. and Jane Doe #2. Grindle and Bocwinski addressed the anonymous complaint as a teaching methods issue rather than sexual harassment.

In January 2005, C.E. told her mother that Sperlik used to bind her with duct tape during band class. Sandra T.E. reported Sperlik's behavior to the Berwyn Police Department, which launched a criminal investigation and shortly thereafter arrested Sperlik. As a result of Sperlik's arrest, several other victims were identified. Each of these students reported that Sperlik bound them with duct tape—typically this was presented by Sperlik as a "game"—and several reported that he had rubbed their thighs or touched their breasts. This abuse

took place between 2001 and 2005, much of it after C.E. and Jane Doe #2 wrote to Grindle. Sperlik has since pleaded guilty to multiple counts of aggravated kidnaping and aggravated criminal sexual abuse, admitting that he abused his students for sexual gratification based on his interest in bondage pornography.

Plaintiffs began the present suit on January 26, 2005. On February 27, 2009, the parties filed cross-motions for summary judgment. On July 23, 2009, the district court granted summary judgment in favor of all individual defendants except for Grindle and Sperlik.[1] Grindle appeals, arguing that the plaintiffs' substantive due process and equal protection claims are barred by the doctrine of qualified immunity.

## II.  Analysis

We review de novo a district court's denial of summary judgment on qualified immunity grounds. *Baird v. Renbarger*, 576 F.3d 340, 343-44 (7th Cir. 2009). In so doing, we view the facts in the light most favorable to the plaintiffs. *Shipman v. Hamilton*, 520 F.3d 775, 778 (7th Cir. 2008). When determining if an official is entitled to qualified

---

[1] In addition to the § 1983 claims discussed in this appeal, plaintiffs brought Title IX and state law claims against the school district and several school officials. The Title IX claim and several of the state law claims against the district and the plaintiffs' claims against Sperlik individually are currently set for trial.

immunity, we first ask if the facts show that the official conduct violated a constitutional right. If they do, we ask whether the violated right was "clearly established" at the time of alleged violation. If so, the official is not entitled to qualified immunity from suit. *See Michael C. v. Gresbach*, 526 F.3d 1008, 1013 (7th Cir. 2008).

We begin with plaintiffs' equal protection claim. We have previously held that sexual abuse by a teacher can deprive a student of his or her right to equal protection under the law. *See Doe v. Smith*, 470 F.3d 331, 334 (7th Cir. 2006).[2] Grindle concedes that under this court's decision in *Nanda v. Moss*, 412 F.3d 836 (7th Cir. 2005), she could be held liable for the equal protection violation of a subordinate that occurred with her knowledge and consent. *Nanda*, however, was decided in June 2005, four years after Grindle's meetings with C.E. and Jane Doe #2, and several months after Sperlik's arrest. Because her conduct pre-dated *Nanda*, she argues, the constitutional right she allegedly violated was not clearly established at the time. Grindle argues that she could not be held liable under the equal protection analysis in an earlier case, *Nabozny v. Podlesny*, 92 F.3d 446 (7th Cir. 1996). In *Nabozny*, we relied on the plaintiffs' allegation that male-on-female harassment was punished differently

_____

[2] In *Doe*, we held that the plaintiffs' § 1983 claims against school officials other than the alleged abuser were preempted by Title IX. The Supreme Court has since decided *Fitzgerald v. Barnstable*, 129 S. Ct. 788 (2009), which held that Title IX does not preempt § 1983 lawsuits against school officials or school districts.

than male-on-male harassment to reverse a grant of summary judgment, noting that "[i]f Nabozny's evidence is considered credible, the record taken in conjunction with the defendants' admissions demonstrates that the defendants treated male and female victims differently." 92 F.3d at 454-55.

The fact that *Nanda* was decided after her allegedly unconstitutional conduct does not entitle Grindle to qualified immunity. *Nanda* was a straightforward application of the standard of supervisory liability articulated in *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988). In *Jones*, we held that while there is no theory of respondeat superior for constitutional torts, supervisors can violate the Constitution themselves if they "know about the [unconstitutional] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Id.* at 992. Indeed, we rejected a qualified immunity defense in *Nanda* because it was well-established that sexual harassment in an educational setting can violate the equal protection clause, and that an administrator's ratification of that conduct could also violate the Equal Protection Clause. *Id.* at 844. This law was no less developed in 2001-2005, when Grindle ignored her students' complaints, than it was in 1998, when the defendant in *Nanda* ignored complaints from faculty stating that the plaintiff's termination was gender-based. At the time of the events at issue in this litigation, it was clearly established in this circuit that a supervisor could be held liable for participating in or deliberately turning a blind eye to the equal protection violation of her subordinate.

The parties focused their briefing on whether a theory of supervisory liability for equal protection claims was clearly established at the time of Grindle's conduct. However, as the Supreme Court has made clear in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), an equal protection claim against a supervisor requires a showing of intentional discrimination. Because there is no theory of *respondeat superior* for constitutional torts, a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948. In the equal protection context, this means showing that the supervisor, like the subordinate, intended to discriminate on the basis of a protected class. *Id.* at 1948-49. While it appears that our precedent would have previously allowed a plaintiff to recover from a supervisor based on that supervisor's "deliberate indifference" toward a subordinate's purposeful discrimination, *see Nanda*, 412 F.3d at 842, after *Iqbal* a plaintiff must also show that the supervisor possessed the requisite discriminatory intent.

Nonetheless, even in light of *Iqbal*, plaintiffs have offered evidence sufficient to defeat summary judgment on Grindle's qualified immunity defense. Plaintiffs need not prove discriminatory intent in the same manner it was established in *Nabozny*, where male and female victims were treated differently. Plaintiffs have offered evidence that would let a jury easily conclude that Sperlik, acting under color of state law, denied the girls equal protection by molesting and abusing them. Plaintiffs have also offered evidence that would allow a jury to conclude that Grindle knew about Sperlik's abuse of the

girls and deliberately helped cover it up by misleading the girls' parents, the superintendent, and other administrators. From this evidence, a jury could reasonably infer—though it would not be required to infer—that Grindle also had a purpose of discriminating against the girls based on their gender. *Cf. Bohen v. City of East Chicago, Ind.*, 799 F.2d 1180, 1190-91 (7th Cir. 1986) (Posner, J., concurring) (suggesting that policy of deliberately refusing to respond to complaints of sexual harassment would support an inference of intentional discrimination). If Grindle wishes to argue that she merely wanted to avoid a scandal or that she would have taken similar steps to conceal abuse if boys had been the victims, she can present those arguments to the jury, but such suggestions do not mean that she is entitled to judgment as a matter of law. She did report some of the complaints about Sperlik, but attempted to downplay those parts of the complaints that showed they were about sexual abuse rather than "pedagogical issues" or "teaching methods." From this evidence, a jury could conclude that by attempting to convert claims about sexual abuse by Sperlik into complaints about teaching methods, Grindle treated the girls' complaints differently because of their sex. *Cf. Bohen*, 799 F.2d at 1191 (contrasting hypothetical policy of ignoring all employee misconduct with policy of ignoring only sexual harassment). Finally, we note that the Equal Protection Clause does not require that the state actor be motivated *solely* by the plaintiff's membership in a protected class. *See Personnel Adm'r v. Feeney*, 442 U.S. 256, 279 (1979) (discrimination can be found only when decision maker chooses course

of action "at least in part 'because of' " individual's membership in a protected class). Even if Grindle was motivated in part by a desire to avoid disciplining teachers in general, she could still be held liable if she treated the plaintiffs' claims differently because they were made by girls targeted for sexual abuse.

Next, we turn to plaintiffs' other claim: that Grindle violated 42 U.S.C. § 1983 by depriving them of their substantive due process right to bodily integrity. There are two types of substantive due process violations. The first occurs when the state actor's conduct is such that it "shocks the conscience." *See Rochin v. California*, 342 U.S. 165, 172-73 (1952). The second occurs when the state actor violates an identified liberty or property interest protected by the Due Process Clause. *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). The Supreme Court has recognized that students have a protected liberty interest in bodily integrity. *See Ingraham v. Wright*, 430 U.S. 651, 672 (1977) (discussing corporal punishment). Grindle does not dispute that Sperlik's conduct violated his victims' constitutional right to bodily integrity, but argues that she had no affirmative duty to protect students at her school from Sperlik's abuse.

Generally, state actors do not have a due process obligation to protect citizens from private violence. *See DeShaney v. Winnebago Cty. Dept. of Social Servs.*, 489 U.S. 189, 195-97 (1989). An exception to that general rule exists when the state has a "special relationship" with the citizen, such as when it takes the person into custody or otherwise imposes limitations on the person's

"freedom to act on his own behalf." *Id.* at 198-201. In *J.O. v. Alton Community Unit Sch. Dist. 11*, 909 F.2d 267 (7th Cir. 1990), we rejected the notion that students are persons with whom the state has a special relationship and owes an affirmative duty of protection. *Id.* at 272. In so holding, *J.O.* distinguished an earlier holding of the Third Circuit, *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989). In *Stoneking*, the Third Circuit held that school officials could be held liable for adopting policies that were deliberately indifferent to the constitutional right of students to bodily integrity. *Id.* at 725. In *J.O.*, we held that *Stoneking* did not apply because the plaintiffs had not "alleged that the school defendants promoted school policies that 'encourag[ed] a climate to flourish where innocent [children] were victimized.'" 909 F.2d at 271-72 (quoting *Stoneking*). Grindle argues that because none of our decisions have explicitly adopted *Stoneking*, it cannot be considered clearly established for the purpose of qualified immunity.

Grindle's argument misses the mark. For a constitutional right to be clearly established, the state official need only have "reasonable notice . . . that certain conduct violates constitutional rights." *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). The plaintiff need not point to a "fundamentally similar" past case. *Id.* While no holding from this circuit has relied on a *Stoneking* theory of liability, two of our decisions have indicated that such a theory is viable. First, *J.O.* itself suggests that a *Stoneking* theory of liability is viable. 909 F.2d at 273 ("[W]e do not believe plaintiffs could never allege sufficient facts to support a section 1983 claim. *See Stoneking v. Bradford*

*Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989).”). Second, in *Nabozny*, we again distinguished *Stoneking* but suggested it was viable, noting that “we agree . . . in principle that the defendants could be liable under a due process theory if Nabozny could show that the defendants created a risk of harm, or exacerbated an existing one.” 92 F.3d at 460. Finally, several district courts within this circuit have applied *Stoneking*. *See, e.g.*, *Doe v. Bd. of Educ. of Consol. Sch. Dist. 230, Cook Cty., Ill.*, 18 F. Supp. 2d 954, 959 (N.D. Ill. 1998); *Doe v. Bd. of Educ. of Hononegah Comm. High Sch. Dist. #207*, 833 F. Supp. 1366, 1377-78 (N.D. Ill. 1993); *Peck v. West Aurora Sch. Dist. 129*, 2006 WL 2579678, at *4 (N.D. Ill. 2006); and *Doe by and through Doe v. Evanston Twp. Sch. Dist. 202*, No. 93 C 1011, 1994 WL 55652, *1-2 (N.D. Ill. 1994). While district court decisions alone do not clearly establish a right for the purpose of qualified immunity, the number and unanimity of these decisions, combined with our circuit-level precedent, show that a reasonable school principal would have concluded that she could be held liable for turning a blind eye to and affirmatively covering up evidence of child sexual abuse by one of her teachers.

Finally, we must address the impact of *Iqbal* on plaintiffs’ due process claim. It is important to note that, as in *Stoneking*, plaintiffs are not relying on a theory that “mere failure of supervisory officials to act” violates the Due Process Clause. *See Stoneking*, 882 F.2d at 730. Rather, plaintiffs allege that Grindle is liable for actively concealing reports of abuse and creating an atmosphere that allowed abuse to flourish. In other words, they argue that Grindle’s own actions deprived them of their

constitutional right to bodily integrity. Because plaintiffs seek to do no more than hold Grindle liable "for . . . her own misconduct," their substantive due process theory is not foreclosed by *Iqbal*. 129 S. Ct. at 1949; *cf. Jones*, 856 F.2d at 992-93 (noting that supervisors can only be held liable for their personal involvement in unconstitutional conduct, which must rise above the level of inactionable negligence or gross negligence). When a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution, regardless of whether the actor is a supervisor or subordinate, and the actor may be held liable for the resulting harm.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Grindle's motion for summary judgment based on qualified immunity.