In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-1979

JIMMY E. SMITH, JR.,

*Plaintiff-Appellant,*

*v.*

SANGAMON COUNTY SHERIFF'S DEPARTMENT, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 07-CV-3150—**Byron G. Cudmore**, *Magistrate Judge.*

ARGUED SEPTEMBER 21, 2012—DECIDED APRIL 19, 2013

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. The Sangamon County Sheriff's Department administers the Sangamon County Detention Facility in Springfield, Illinois. In 2005 Jimmy Smith, Jr., was charged with impersonating a police officer and was detained in the jail pending trial. Because he had a parole hold and a history of problems during a prior detention, Smith was housed in a maximum-security cellblock. While there, he was se-

verely beaten by another inmate who was awaiting trial on armed-robbery and aggravated-battery charges.

Smith blames the Sheriff's Department for his injuries; he filed suit under 42 U.S.C. § 1983 claiming that the Department's approach to classifying inmates for cell-block placement ignores serious risks to inmate safety in violation of his due-process rights under the Fourteenth Amendment. More specifically, he alleged that the Department's security classification policy fails to separate "violent" from "nonviolent" inmates and thus fails to protect peaceful inmates from attacks by inmates with assaultive tendencies. A magistrate judge entered summary judgment for the Sheriff's Department, and Smith appealed.

We affirm. To avoid summary judgment, Smith needed evidence that the jail's security classification policy systematically fails to address obvious risks to inmate safety. He has no such evidence. Accordingly, there is no factual support for Smith's constitutional claim that the Sheriff's Department was deliberately indifferent to a known risk of injury to him.

## I. Background

When an inmate arrives at the Sangamon County Detention Facility, the Sheriff's Department assigns a security classification for purposes of the inmate's housing placement within the jail. A classification officer interviews each new detainee and reviews a range of information, including the inmate's age,

gender, gang affiliation, medical concerns, current charge, criminal history, behavioral and disciplinary history within the jail, and any holds due to parole violations. Pursuant to standards recommended by the American Correctional Association, the classification policy assigns point values within these categories, with higher point values corresponding to lower security risks. For example, in the "Present Offense" category, an inmate charged with a misdemeanor property offense—more broadly, any misdemeanor crime not committed against a person—receives three points, while an inmate charged with a felony against a person gets zero. Inmates also can identify "enemies" in the jail who may pose a threat to their safety. If credible, an inmate's "enemies list" is taken into account in cellblock placement decisions.

As the classification system is structured, a higher point total means a lower security status. Inmates assigned more than 18 points go to medium- or minimum-security cellblocks, and inmates assigned 18 points or less go to maximum-security cellblocks. Depending on the mix of classification factors, inmates charged with violent crimes may be housed with inmates charged with nonviolent crimes. An inmate's initial classification is not necessarily permanent, however. Placements are regularly reviewed, and an inmate may request a change in his classification status at any time. Corrections officers move inmates from cellblock to cellblock about 50 to 100 times per year, and a classification officer acknowledged that "quite a lot" of these moves are due to inmate fights or violence.

Smith entered the jail on February 28, 2005, charged with impersonating a police officer. This was not his first detention in the Sangamon County jail. Three years earlier, he was charged with burglary and later convicted. This time around, classification officer John Kirby assessed Smith under the security classification policy. Based largely on a parole hold and Smith's history of "documented special problems," Kirby assigned him just eight points. The parole hold is easy to understand, but the "special-problems" category requires some explanation. "Special problems" status covers a variety of past difficulties in the jail or at other correctional facilities and also any security problems noted during arrest. Smith received two points in this category based on a history of moving from cellblock to cellblock during his previous detention; these moves were unrelated to violence or disciplinary infractions by Smith himself. The eight-point score meant that Smith was assigned to maximum security. The "special problems" factor wasn't consequential for Smith's housing classification, however. Without the history of institutional problems, he would have "earned" three points in this category, keeping his total score low enough for maximum security. At no time did he request a change in security classification.

On May 13, 2005, Jason Newell was booked into the jail on charges of armed robbery and aggravated battery. Classification officer Vincent Fox assigned him ten points under the security classification system based on his gang affiliation, criminal record, and the severity of the charges against him. Newell had no institutional

record, and neither Fox nor Kirby was familiar with him. Newell was placed in maximum security and assigned to Cell Block D.

On May 22 Smith was moved to Cell Block D as a result of an attack by another inmate in his original cellblock. Specifically, Smith's cellmate punched him in the face because he would not move his feet while the cellmate was cleaning the floor.[1] Upon his arrival in Cell Block D, Smith was housed with Newell. There were no reports that Newell had been violent thus far in his detention. Smith did not challenge his transfer or complain about Newell being a threat.

On June 8 Newell attacked Smith and seriously injured him. Smith's injuries were severe enough to wipe out his recollection of the event, but an investigation revealed what happened. Witnesses said that Newell and another inmate got into a fight over the cellblock's TV remote, and Newell punched that inmate several times. Smith went to a window to signal a guard that there was a problem. Newell then turned on Smith and severely beat him. Guards arrived and took Smith for medical attention. Witnesses reported

---

[1] Smith was administratively charged with "fighting" after this incident, though he apparently had not been violent and did not retaliate against the inmate who hit him. Rather, Smith reported that he was quietly reading his Bible in his cell when his cellmate punched him for not moving his feet out of the cellmate's way. The fighting charge against Smith had no impact on his security classification.

that prior to the beating, Newell had been picking on Smith and had threatened to kill him if he ever snitched. They also reported that Newell was often looking for a fight, while Smith was harmless and not an instigator.

Smith filed this suit under § 1983 against the Sheriff's Department and several individual officers alleging that they were deliberately indifferent to a known risk of serious injury in violation of his rights under the Fourteenth Amendment. He later dropped his claims against the individual officers and opted to proceed only against the Sheriff's Department. The premise of his sole remaining claim was that the Department's security classification policy failed to protect peaceful inmates like him from a serious risk of assault by inmates who were prone to violence. A magistrate judge entered summary judgment for the Sheriff's Department, holding that Smith had failed to produce evidence raising a triable issue of fact regarding whether the Sheriff's Department, through its design and implementation of the classification policy, was deliberately indifferent to inmate safety.

## II. Discussion

We review the district court's grant of summary judgment de novo, considering the evidence in the light most favorable to Smith and "drawing all reasonable inferences" in his favor. *Lewis v. Downey*, 581 F.3d 467, 472 (7th Cir. 2009). Summary judgment is appropriate if the evidence demonstrates that there is "no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Because Smith was a pretrial detainee, his deliberate-indifference claim arises under the Fourteenth Amendment's Due Process Clause but is governed by the same standards as a claim for violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008); *Henderson v. Sheahan*, 196 F.3d 839, 844 n.2 (7th Cir. 1999). Depriving a prisoner of "basic human needs like food, medical care, sanitation, and physical safety" violates the Eighth Amendment, but only if the defendant acted with deliberate indifference to the prisoner's serious needs; negligence is not enough. *James v. Milwaukee County*, 956 F.2d 696, 699-700 (7th Cir. 1992); *see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 530 (7th Cir. 2000).

"A finding of deliberate indifference requires a showing that the [defendant] was aware of a substantial risk of serious injury to [the plaintiff] but nevertheless failed to take appropriate steps to protect him from a known danger." *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002). Both the Eighth and Fourteenth Amendments, then, "impose upon prison officials a duty to protect inmates from violent assaults at the hands of fellow prisoners," *Klebanowski*, 540 F.3d at 637 (citing *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)), but the duty is violated only by deliberate indifference to a known substantial risk. Prison and jail officials "[are] not . . .

required to guarantee the detainee's safety. The existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000).

There is no question that Smith suffered a serious physical injury inflicted by another inmate. Summary judgment turned on the sufficiency of Smith's evidence of deliberate indifference. Because Smith abandoned his claims against the individual officers and proceeded only against the Department under a theory of municipal liability, he had to establish deliberate indifference by reference to an official custom or policy. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690-91, 694 (1978); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("[T]here must be an affirmative link between the policy and the particular constitutional violation alleged."); *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003) (explaining that "to establish a genuine question of fact as to whether [the defendant was] deliberately indifferent to [the plaintiff's] safety," the plaintiff must show that the defendant has "a custom or policy that contributed to the infliction of the assault and his resulting injury").

Smith contends that the security classification policy used by the Department to assign inmates to cellblocks within the jail does not do enough to separate violent from nonviolent inmates. He maintains that the Department knew that nonviolent inmates were at serious risk of harm from violent inmates housed in the same cell-

block and that the classification policy was inadequate to prevent that risk from being realized. In other words, by following the classification policy, the Sheriff's Department was deliberately indifferent to inmate safety.

Smith's deliberate-indifference argument relies on the fact that the classification policy fails to strictly segregate "violent" from "nonviolent" offenders based on their pending or past charges. It is true that the policy does not assign inmates to a security classification based *solely* on criminal history or the nature of the inmate's current charge. Those factors are prominently considered, but the policy accounts for a variety of other factors as well. Depending on an inmate's total points, the policy allows for the possibility that any inmate, regardless of the charged offense, may be placed in a maximum-security cellblock. Thus, an inmate (like Newell) who is charged with a violent crime can be housed in the same block as an inmate (like Smith) who is charged with a nonviolent offense. This, Smith contends, ignores an obvious risk to the safety of inmates detained in the jail on nonviolent charges.

As the district court held, however, there is a fundamental failure of proof on this claim. Smith presented no evidence that this feature in the classification policy creates a serious risk of physical harm to inmates, much less that the Sheriff's Department knew of it and did nothing. Smith had the burden to show that the classification system created "a risk of serious harm [that] was so patently obvious that the municipality must have been aware of [a] risk of harm and,

by failing to act to rectify it, sanctioned the harmful conduct." *Estate of Novack*, 226 F.3d at 530; *see also James*, 956 F.2d at 700. A risk of serious harm may be shown, for example, by evidence of "a series of bad acts" that "the policymaking level of government was bound to have noticed," *Estate of Novack*, 226 F.3d at 531 (internal quotation marks omitted), like a pervasive pattern of assaults or the existence of an identifiable group of prisoners at particular risk of assault, *Walsh v. Brewer*, 733 F.2d 473, 476 (7th Cir. 1984).

Here, however, Smith presented no evidence that the Department had notice of a particular threat of harm to him, that the classification system exposed him to a serious risk of harm, or even that the Department knew of a more generalized risk and ignored it. He cites the post-attack witness interviews suggesting that Newell was "looking for a fight" and had been picking on Smith, but these witness statements are vague, contemporaneous with the assault, and not indicative of prior notice to the Sheriff's Department that the classification system itself posed a serious safety risk. There is no evidence that these warnings were communicated to jail officials before the attack. Even if they were, that would not be enough to impute knowledge to the Sheriff's Department or its policymaking officials. Nor would it link the attack on Smith to any supposed flaw in the classification policy.

Likewise, Smith presented no evidence of a history of assaults by other inmates. He points to the attack that prompted his transfer to Cell Block D, noting that he was quietly reading his Bible in his cell when his

cellmate punched him in the mouth for not moving his feet when asked. From this and other evidence (Smith is apparently not a large man and has a history of depression), we are asked to infer that he was vulnerable to abuse by other inmates because he was meek and not a troublemaker. Perhaps so, but that does not advance the particular claim he makes here. To repeat, in order to proceed against the Sheriff's Department, Smith needed to show that by adhering to the security classification policy, the Department was deliberately indifferent to a serious risk to his physical safety. The attack by his cellmate is not enough to establish that the *policy itself* systematically exposed inmates like him to serious risk of harm.

Nor has Smith presented evidence of an obvious and more general risk of serious harm to nonviolent inmates that might support an inference that the classification policy wasn't doing enough to prevent violence and the Sheriff's Department knew it. He does not show, for example, a pattern of attacks by jail inmates who could be characterized as violent when housed in the same cellblock as inmates who could be characterized as nonviolent. *See James*, 956 F.2d at 701. The only evidence Smith has of jail violence more generally is a statement by Kirby that he reclassifies inmates 50 to 100 times per year, many because of fighting. But Kirby's statement is too general to prove the claim. Smith has not attempted to show that most or indeed any of the fights that precipitated these reclassifications were the result of violent inmates preying on nonviolent ones, or even that they were one-sided attacks rather than mutual altercations. He pro-

posed no expert testimony and presented no historical data regarding assaults in the jail. He hasn't attempted to show that the risk of harm from inmate violence was extremely high, nor has he linked the incidents of fighting in the jail to some sort of obvious and preventable pattern. If there was a specific risk to inmates charged with nonviolent crimes, it was not sufficiently specific and apparent to put the Sheriff's Department on constructive notice.

As a general matter, jail administrators are of course aware of the risks inherent in housing persons accused of different kinds of crimes together, but Smith has not shown that the Sheriff's Department ignored that risk in the design or implementation of the security classification policy. To the contrary, the record suggests that the classification policy is designed to mitigate that risk and respond to it if it arises. First, the policy considers violent tendencies in the first instance; it does so indirectly by accounting for gender, age, and gang affiliation, for example, and it does so directly by considering the inmate's criminal history, institutional history, and current charge. *Cf. Walsh v. Mellas*, 837 F.2d 789, 797-98 (7th Cir. 1988) (criticizing a prison's failure to screen inmates for gang affiliation, which could have helped prevent gang-related violence). It is hard to imagine how else the jail could objectively evaluate whether an inmate poses a threat of violence.[2]

---

[2] Smith suggests that the policy should take account of an inmate's violent or nonviolent demeanor. This strikes us

(continued...)

In addition, the policy allows inmates to identify "enemies" who pose a threat to their safety and if credible, honors requests to be housed away from those inmates. Finally, inmate classifications and security risks may be revisited. As Smith's own case attests, the jail allows for cellblock transfers due to inmate threats or violence. Inmates may also request reclassification to a different security level at any time.

When pressed at oral argument to identify a specific problem with the classification system, Smith's attorney suggested that the policy should have placed more weight on the nature of the charge that brought the inmate into the jail. But there is no reason to think that considering other factors *in addition to* the severity of an inmate's current charge is unreasonable. On the contrary, an inmate's criminal record and institutional history are plainly appropriate factors to consider in classifying inmates by security risk. *Cf. Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (explaining the need for "wide-ranging deference" to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). Indeed, the failure to consider other relevant factors beyond the inmate's current charge could obscure a propensity toward violent behavior. An

---

[2] (...continued)
as wholly subjective, easily "gamed" by the inmate, and likely duplicative of other categories, such as institutional history.

inmate's misbehavior during arrest or past inability to function in multiple-inmate cellblocks could easily be a sign of trouble; jail administrators are entitled to infer as much and assign "special problems" status to inmates with these characteristics. The inmate's criminal record is obviously important; Smith does not argue otherwise. He criticizes the classification policy for the weight it assigns to warrants, parole holds, and gang affiliation, but he has no evidence that these features of the system are unsound or irrelevant to jail safety concerns.

Finally, it is not at all clear that a policy strictly separating inmates based on their current charge—segregating those accused of nonviolent crimes from those accused of violent crimes—would do a better job of ensuring inmate safety than the multiple-factor classification system used by the Sheriff's Department. An inmate jailed on a nonviolent charge may have a lengthy rap sheet of violent convictions or an institutional disciplinary record. These additional factors may suggest a need for maximum-security placement but would be overlooked by a policy that focused exclusively or even primarily on the nature of the offense that brought the inmate to the jail.

In short, Smith has presented no evidence that the security classification policy creates an obvious and systematic risk to inmate safety and that the Sheriff's Department ignored that risk. Accordingly, his constitutional claim fails for lack of proof. The district

court properly entered summary judgment for the Department.

AFFIRMED.