In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3233

REGINALD PITTMAN, BY AND THROUGH
HIS GUARDIAN AND NEXT FRIEND,
ROBIN M. HAMILTON,

*Plaintiff-Appellant*,

*v.*

COUNTY OF MADISON, ILLINOIS,
ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:08-cv-00890-DRH-DGW — **David R. Herndon**, *Chief Judge.*

ARGUED OCTOBER 1, 2013 — DECIDED MARCH 10, 2014

Before CUDAHY, RIPPLE, and HAMILTON, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Reginald Pittman attempted suicide on December 19, 2007, when he was a pretrial detainee at the Madison County Jail. By and through his guardian and appointed next friend, Robin M. Hamilton, Mr. Pittman later brought claims against the County of Madison, Illinois and

various officials of the jail under 42 U.S.C. § 1983 and Illinois state law. He alleged that the defendants were deliberately indifferent to his risk of suicide and that they exhibited willful and wanton conduct by failing to provide adequate medical care and to protect him from suicide. The district court granted summary judgment to the defendants. It concluded that Mr. Pittman had failed to produce sufficient evidence of deliberate indifference or willful and wanton conduct. We believe that a genuine issue of triable of fact exists with respect to the claims against Deputy Werner and Sergeant Eaton. We agree that summary judgment was properly entered with respect to the other defendants, except insofar as Sheriff Hertz and the County may have vicarious liability on the state law claim for the actions of Deputy Werner and Sergeant Eaton. Accordingly, we affirm in part and reverse in part the judgment of the district court. The case is remanded for further proceedings consistent with this opinion.

# I

## BACKGROUND

### A.

Mr. Pittman, a pretrial detainee at the Madison County Jail, attempted to commit suicide by hanging himself from the bars of his cell with a blanket. His attempt resulted in an ischemic anoxic injury to his brain, which rendered him severely brain-damaged and disabled. At the time of this suicide attempt, Sheriff Robert Hertz was the Madison County sheriff; Captain Joseph Gulash was the captain in charge of the jail;

Lieutenant Renee Stephenson, Sergeant Randy Eaton, Officer Matt Werner and Officer Jeffrey Hartsoe worked at the jail; Barbara J. Unfried was the jail's nursing director; and Dr. Robert Blankenship was the jail's medical director.[1]

## 1.

During intake procedures at the jail in August 2007, Mr. Pittman reported that he had no major medical problems, no thoughts about killing or injuring himself, no previous suicide attempts, no signs of depression and no psychiatric history. On October 20, however, he told an officer in the jail that he was suicidal. Mr. Pittman was moved to a holding cell and placed on a fifteen-minute suicide watch. Jail records show that Deputy Werner decided at 10:30 p.m. that night to refer Mr. Pittman to a social worker for evaluation when the social worker came on duty the next day.

On the next day, October 21, Mr. Pittman spoke to medical staff at the jail. Notes from the visit record that Mr. Pittman reported no suicidal ideation but stated that he was unhappy with his housing unit because people there yelled and did not

---

[1] Mr. Pittman also brought claims against various John Doe defendants, but barely mentions these defendants in his appellate brief and does not argue that the district court erred in granting summary judgment for them. We therefore do not discuss those defendants. *See United States v. Stadfeld*, 689 F.3d 705, 712 (7th Cir. 2012) (stating that "[u]nderdeveloped arguments are considered waived"); *see also United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) (noting that an issue not argued by a party is waived). For the same reasons, we do not review the district court's grant of summary judgment for Lieutenant Stephenson and Officer Hartsoe.

sleep. Mr. Pittman was referred to mental health services, where he was seen on October 22.

The jail contracts with a mental health company, Chestnut Health Systems ("CRISIS"), to provide mental health services to detainees and inmates. Tracy Karvinen, a crisis intervention specialist with CRISIS, evaluated Mr. Pittman on October 22. Before her meeting with Mr. Pittman, Karvinen sought his records by phone and learned that he had been evaluated by CRISIS twice in January 2005. Karvinen was told by recordkeepers over the phone that "there was really no history" for Mr. Pittman;[2] she was not given the details of his previous encounters with CRISIS. In fact, unknown to Karvinen, one of Mr. Pittman's encounters with CRISIS had been an episode in January 2005 when Mr. Pittman had been evaluated because he had made suicidal statements during an arrest. During the evaluation following that 2005 arrest, however, Mr. Pittman had denied suicidal ideation and stated that he had never been suicidal.

During his October 22, 2007, meeting with Karvinen, Mr. Pittman was oriented, cooperative and alert; he strongly denied any suicidal ideation or previous suicide attempts. He did present, however, with an anxious, depressed mood, had learned recently of a cousin's death, and reported sleeping problems and missing his family. Mr. Pittman also told Karvinen that he had no mental health or substance abuse treatment history.

---

[2] R.83-4 at 2.

In a progress note, Karvinen recorded that Mr. Pittman had sought her help in changing housing and "stated that he [had] told [jail] staff that he was suicidal in hopes that they would move him out of the lock down block,"[3] where he had been for the previous thirty days. Karvinen concluded that Mr. Pittman's "thought content was on his legal status and wanting to get out of the lock down block."[4] Karvinen and Mr. Pittman discussed and signed a safety contract, which provided that he agreed to inform jail staff if he began to have thoughts of harming himself. After the visit, Karvinen discussed Mr. Pittman's status with jail staff, and they determined that he could be placed in the general population of the jail.

Just over a week later, on October 30, 2007, Mr. Pittman filled out a sick call slip indicating that he needed to see CRISIS and that he could not sleep. Jail staff contacted Karvinen about his request, and she again evaluated him at the jail on October 30. In a progress note from that visit, Karvinen repeated that Mr. Pittman had reported being suicidal on October 22 "in hopes to go to suicide watch then to another block other than lock down."[5] She noted that he strongly denied any current suicidal ideation or past suicide attempts and was oriented, cooperative and alert, though he presented with an anxious, depressed mood and was tearful during the meeting. Mr. Pittman stated that he was "very upset and freaking out"

---

[3] R.53-14.

[4] *Id.*

[5] R.53-15.

because he had discovered that his girlfriend was "cheating on [him]"; he also claimed that he "need[ed] out of here" because he could not stop crying and "can't be back there crying in the blocks."[6] Mr. Pittman told Karvinen that he had requested housing in "seg," a segregated unit, because he could not stop crying and did not want to be around anyone. Karvinen did not consider Mr. Pittman suicidal on October 30.

Karvinen discussed Mr. Pittman's situation with a jail lieutenant, who also spoke with Mr. Pittman. The lieutenant informed Mr. Pittman that he could be placed in segregation temporarily, but that he eventually would have to return to the general population. Jail logs for October 30 record that Mr. Pittman was "housed in the female drunk tank" on a thirty-minute watch.[7] The log notes that he was "NOT suicidal but very upset over problems at home. [Pittman] cried throughout the [CRISIS] interview and needed time to gather his thoughts."[8]

Mr. Pittman was also seen by Nurse Unfried on October 31 after he complained of sleeplessness and depression. She evaluated him and then contacted Dr. Blankenship by phone. Dr. Blankenship noted in a medical file that he discussed Mr. Pittman's complaints of depression with him. He also

---

[6]  *Id.* (internal quotation marks omitted).

[7]  R.60-9 at 2.

[8]  *Id.*

ordered a prescription for Sinequan[9] based on Nurse Unfried's evaluation. Dr. Blankenship wrote in the medical file that Mr. Pittman presented no suicidal ideation. He also prescribed Prozac for Mr. Pittman.[10]

That same day, October 31, 2007, Karvinen again evaluated Mr. Pittman at the jail's request. Their meeting began at or around two o'clock in the afternoon. Karvinen wrote in a progress note that Mr. Pittman continued to have crying spells but strongly denied any current suicidal ideation or previous suicide attempts. She repeated that his thoughts were on his legal status, his girlfriend and his desire to move out of his housing unit. After Karvinen discussed Mr. Pittman's status with him and with jail staff, she recommended returning him to the general jail population.

Although Mr. Pittman was cleared by CRISIS to return to the general population, he instead had been moved to the "Male Drunk Tank for observation due to personal reasons" by 8:15 p.m. on October 31.[11] Jail logs show that Mr. Pittman had

---

[9] Sinequan is a preparation of doxepin hydrochloride, an antidepressant used to treat conditions including but not limited to depression and chronic pain. *Dorland's Illustrated Medical Dictionary* 565, 1719 (32d ed. 2012).

[10] Prozac is a preparation of fluoxetine hydrochloride that is used to treat depression and obsessive-compulsive disorder, among other conditions. *Id.* at 722, 1539.

[11] R.60-9 at 2.

"started crying and said he needed to be moved."[12] On November 1, prison logs show that Mr. Pittman was placed in the Special Housing Unit ("SHU") at nine in the morning "per crisis."[13] SHU is a step-down or intermediate unit for detainees outside the general population. By the afternoon of November 1, however, Mr. Pittman was set to be moved back to the general population after prison logs recorded that he had been "banging on [the] wall [in] SHU yelling move me I'm not crazy."[14]

A few days later, on November 4, 2007, Mr. Pittman filled out a sick call slip stating that he had been vomiting. He was evaluated by Nurse Unfried the next day, but he reportedly denied having executed the sick call slip. On his way back from visiting the nurse, Mr. Pittman engaged in an altercation with another inmate whom the jail had been attempting to keep separate from him. Captain Gulash subsequently ordered that Mr. Pittman should be shackled and handcuffed whenever he left his cell because of his repeated fights with other inmates.

Mr. Pittman submitted another sick call slip on November 24, 2007, in which he complained of stomach problems, an

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

inability to eat, stress and depression. Nurse Unfried saw him on November 26 and ordered Tagamet.[15]

On December 1, 2007, Mr. Pittman was moved from the general population to "the male drunk tank … until suitable housing can be found" because he was "throwing feces and urine" at another inmate.[16] He was moved to the SEG-3 housing unit on December 4 "to free up space in the male drunk tank."[17] The SEG-3 housing unit is away from the general population; each detainee there has his own cell with a shower, basin, steel bunk and cell door. When he attempted suicide on December 19, Mr. Pittman was in SEG-3 and was not on suicide watch.

Bradley Banovz, an inmate who was housed in SEG-3 with Mr. Pittman, testified that Mr. Pittman had begun fighting and "moving around" in the jail in response to family problems.[18] He stated that Mr. Pittman was depressed and that he had urged Mr. Pittman to ask for help. Banovz admitted that the only statement that Mr. Pittman ever had made to him indicating that Mr. Pittman might be suicidal was a joke a week before the suicide attempt. Banovz reported that he and

---

[15] Tagamet is a preparation of cimetidine that inhibits gastric acid secretion and is used in the prevention and treatment of stomach problems. *Dorland's Illustrated Medical Dictionary* at 361, 1869.

[16] R.60-9 at 2.

[17] *Id.* at 3.

[18] R.78-2 at 24.

Mr. Pittman often had jested and that he did not consider the comment more than a joke.

**2.**

According to Banovz, Deputy Werner and Sergeant Eaton both ignored requests from Mr. Pittman for CRISIS help in the days leading up to his suicide attempt. Banovz reported that Mr. Pittman had asked Deputy Werner to let him speak to CRISIS on Friday, December 14, a few days before his Wednesday suicide attempt. Banovz recalled that Mr. Pittman was not crying and was calm when he asked Deputy Werner to contact CRISIS, but that he lacked his customary spunk. Deputy Werner reportedly told Mr. Pittman that he would ensure that Mr. Pittman saw CRISIS on Monday when Deputy Werner returned to work, but did not take Mr. Pittman's CRISIS request seriously and joked with Mr. Pittman about it. At some point, Banovz reported, Banovz told Deputy Werner that "your boy [Mr. Pittman] over there needs help."[19] Deputy Werner did not refer Mr. Pittman to CRISIS that week and denied that the alleged conversations could have taken place. Deputy Werner was not on duty when Mr. Pittman attempted suicide the following Wednesday.

Banovz also stated that, on December 18, Mr. Pittman cried intermittently for three to five hours and asked Sergeant Eaton to let him speak with CRISIS. Banovz testified that Sergeant Eaton saw Mr. Pittman crying during Sergeant Eaton's rounds of the jail that night and, at

---

[19]  R.60-3 at 8.

Mr. Pittman's request, agreed to sign Mr. Pittman up for a CRISIS visit before leaving to continue his rounds.[20] Mr. Pittman was not taken to CRISIS, however, and no record of a request from that night exists. For his part, Sergeant Eaton denies he would have ignored a CRISIS request like the one described by Banovz. Sergeant Eaton finished his shift on December 19 at 6:00 a.m. and was therefore not on duty during Mr. Pittman's suicide attempt at or around 9:30 p.m. that night.

A few hours before he attempted suicide, Mr. Pittman wrote a letter to his grandmother. The letter stated:

> Dont think im Weak for What im about to do
> I Will never Snitch i wuld rather Die
> tail Paris i love her in let her no im
> sorry tail her that the world was to much
> for me make her understand for me
> Pleas I Love u and i wish i culd
> have seen u One more last time
> every body thinks im Playen or Joking
> but this is real
> I just cant take it
> NO More i Wuld Rather
> Die I tryed to talk to the
> Crisis Lady but thay ant

---

[20]  According to Banovz, the guards generally treated Mr. Pittman well and Sergeant Eaton was "a good guy" who would usually "help [people with problems] out." R.78-2 at 8.

let me i told them no one listen to me[.][21]

To the side of the main text, the note added "I Love u G-ma Shirley Sorry" and "the Gaurds keep fucking with me."[22]

The night of Mr. Pittman's suicide attempt, various guards completed rounds each half hour that included Mr. Pittman's cell. None of the jail records from that night record alarming behavior from Mr. Pittman. At or around 9:30 p.m. on December 19, however, Officer Hartsoe spotted Mr. Pittman hanging from a blanket that Mr. Pittman had tied to his cell bars. Officer Hartsoe lifted Mr. Pittman to relieve the pressure on his neck while Lieutenant Stephenson untied the blanket. Lieutenant Stephenson then radioed for assistance while Officer Hartsoe began CPR.

### 3.

From 2005 to 2010, there were thirty-six suicide attempts with injury and three successful suicides at the Madison County Jail. The jail is required by the Illinois County Jail Standards to have policies and procedures to address the risk of suicide. It also must train officers annually on suicide prevention. The jail complied with the annual training requirement through videos and talks, and it had written policies and procedures for suicide prevention. A two-page outline of the suicide prevention policies states that "[i]t is the responsibility of any jail officer … to report … any concerns" about an inmate

---

[21]  R.60-2 at 40.

[22]  *Id.*

or detainee who may harm himself.[23] The policies do not specify who makes the determination to take action, noting only that "[a]s soon as any concern regarding an inmate/detainee[']s potential for harming him/herself … arises, measures will be taken to protect the inmate/detainee from him/herself."[24] The policies require that a detainee's request for CRISIS intervention be written or recorded, but requests for CRISIS intervention are not necessarily interpreted to mean that a detainee is suicidal. Once someone is placed on suicide watch, he or she may only be removed after being cleared through CRISIS or jail medical staff.

The jail policies also list signs and symptoms of potential suicide cases, including excessive crying, extreme mood swings and frequent physical complaints. One of the listed suggestions for handling suicidal or mentally ill inmates instructs officers to "[t]ake time to analyze the situation and give the inmate time to regain his/her composure."[25] In the materials describing how to respond to an attempted suicide, there is also a "SPECIAL NOTE" adding that "any attempted suicide … is to be treated as an individual incident[;] therefore this procedure is to be used as a guideline and not as stead fast [sic] rules."[26]

---

[23] R.60-8 at 3.

[24] *Id.*

[25] *Id.* at 7.

[26] *Id.* at 10.

**4.**

Sergeant Eaton testified that, as a general practice, if someone approached him to make a CRISIS request during the night he would refer the person to CRISIS the next day unless the person's need to see CRISIS was urgent. When someone requested CRISIS, Sergeant Eaton's response would "depend[] on the situation"; he would "pull them out of the cell block and try to dig deeper" into the problem behind the person's request or his signs of depression.[27]

Deputy Werner's testimony was substantially similar. He admitted that, depending on the context and apparent seriousness of a CRISIS request, he would sometimes try to resolve a person's concerns himself instead of referring the inmate or detainee to CRISIS. If he felt the problem had been solved, he sometimes would not submit the paperwork for a CRISIS request. Deputy Werner testified that he thought making an individual assessment of whether CRISIS help was necessary was "just the policy I believe the Madison County Jail has," although he was not "100 percent certain of that."[28] Deputy Werner added, however, that if Mr. Pittman had asked him to visit CRISIS in the way that Banovz alleged, that Deputy Werner would have filled out a CRISIS intervention sheet for Mr. Pittman.

Other jail personnel echoed many of Sergeant Werner's and Officer Eaton's statements about individual officers' discretion:

---

[27]  R.60-12 at 15.

[28]  R.60-13 at 4.

Although an officer could not ignore a known risk, much of the threat assessment process reportedly was within the discretion of individual officers. Captain Gulash, for example, agreed that it "would be a problem" if an officer "simply [did] not address[]" an inmate's request for CRISIS intervention, but added that officers had the discretion to "make a judgment call" about whether to place an inmate or detainee under observation, on suicide watch or to leave that person in the cell block "depend[ing] on the situation."[29] Captain Gulash explained that an officer would assess a potential suicide risk by having a conversation with the inmate or detainee. Officer Hartsoe testified that officers would assess the risk of suicide by looking for symptoms such as crying, making suicidal statements or noting that the inmate or detainee had just received bad news from home. When asked who makes the determination to take suicide prevention measures, Lieutenant Stephenson replied that she made the determination as an individual officer. Lieutenant Stephenson stated that if someone said he were depressed, "[t]hey are pulled out and talked to" to "[f]ind out why they are depressed."[30] She added, "[t]here is a record if we feel we have to place them on suicide watch or for [CRISIS] to see them in the morning, depending on how severe when we talk to them, but they are still put on suicide watch."[31]

---

[29]  R.60-15 at 6, 32.

[30]  R.53-3 at 4.

[31]  *Id.*

Jail policy required officers to report requests for CRISIS assistance, and testimony from several defendants reflected knowledge of that policy. Sergeant Eaton testified that if an inmate or detainee approached him and stated that he needed to speak with CRISIS, the Sergeant would fill out a crisis intervention form and give it to jail nursing staff. Deputy Werner similarly attested that, based on jail procedure, if Mr. Pittman had asked him to see CRISIS, the officer would have filled out an intervention form. Captain Gulash also stated that officers needed to prepare a report in response to a CRISIS assistance request. Officer Hartsoe testified that if an inmate or detainee requested to see CRISIS, the officer would fill out a form or contact CRISIS.

## B.

Mr. Pittman brought this 42 U.S.C. § 1983 action alleging that the County of Madison, Captain Gulash, Sheriff Hertz, Sergeant Eaton, Deputy Werner, Dr. Blankenship and Nurse Unfried had violated his constitutional rights through deliberate indifference to his suicide risk because they failed to provide him with necessary medical attention and protection. Mr. Pittman alleged that the defendants failed to train personnel, to protect and monitor detainees and inmates, to provide appropriate health care and mental health services, and to properly house inmates and detainees at risk for suicide. Mr. Pittman also sought injunctive relief under § 1983 to require Madison County, Captain Gulash and Sheriff Hertz to provide written treatment plans for each jail detainee receiving psychiatric services. Mr. Pittman further claimed that Madison

County and Sheriff Hertz violated Illinois state law prohibiting willful and wanton actions because they failed to implement proper suicide prevention policies and practices.

The district court granted the defendants' motion for summary judgment. It concluded that Mr. Pittman had failed to meet his burden of demonstrating a genuine issue of material fact about whether the defendants violated Mr. Pittman's rights to receive necessary mental health care or to be protected from self-harm. Mr. Pittman submitted a motion for a new trial under Federal Rule of Civil Procedure 59(b) and to amend the judgment under Rule 59(e). The district court denied those motions, and it also denied as moot a motion from Mr. Pittman to file a fourth amended complaint. Mr. Pittman appeals the grant of summary judgment for the defendants.

## II

## DISCUSSION

### A.

We review the district court's grant of summary judgment de novo. *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012). Section 1983 imposes liability when a defendant acts under color of state law and violates a plaintiff's rights under the Constitution or laws of the United States. 42 U.S.C. § 1983. It is undisputed that the defendants acted in their capacities as state actors; the only issue to be decided is whether Mr. Pittman has presented adequate proof of a deprivation of a right.

The Due Process Clause of the Fourteenth Amendment prohibits "deliberate indifference to the serious medical needs of pretrial detainees." *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). This provision applies essentially the same deliberate indifference analysis to detainees as the Eighth Amendment does to inmates.[32]

A plaintiff claiming a constitutional violation under § 1983 for denial of medical care must meet both an objective and a subjective component. First, he must show that his medical condition was objectively serious. Suicide certainly satisfies that component. *See Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). Second, the plaintiff must show that the defendant officials had a sufficiently culpable state of mind—that their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a risk of suicide is present when an official is subjectively "aware of the significant likelihood that an inmate may imminently seek to take his own life" yet "fail[s] to take reasonable steps to

---

[32] *See Smith v. Sangamon Cnty. Sheriff's Dep't*, 715 F.3d 188, 191 (7th Cir. 2013) (noting that detainee's deliberate indifference claim was "governed by the same standards as a claim for violation of the Eighth Amendment's prohibition against cruel and unusual punishment"); *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998) (stating that "[b]oth the Eighth Amendment and this limited form of substantive due process require the state to provide … minimum levels" of medical care and reasonable safety to detainees). Pretrial detainees therefore are entitled to reasonable medical treatment for serious medical needs, including mental health needs. *See Collignon*, 163 F.3d at 990.

prevent the inmate from performing the act." *Collins*, 462 F.3d at 761 (citing *Estate of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)). An official must be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and the official "must also draw the inference." *Higgins v. Corr. Med. Servs. of Ill., Inc.*, 178 F.3d 508, 511 (7th Cir. 1999) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

### 1.

We turn first to Mr. Pittman's deliberate indifference claims against Deputy Werner and Sergeant Eaton. The district court held that there was no genuine issue of material fact as to these defendants' liability because the conversations that Banovz alleged the officers had with Mr. Pittman were "too remote and tenuous in time as to [Mr.] Pittman's attempted suicide." According to the district court, the record did not suggest that the officers were aware of Mr. Pittman's medical records or any other sign that he was at a substantial risk of suicide, especially because Mr. Pittman "in the past requested CRISIS to manipulate the prison staff into moving him to different housing."[33]

In urging reversal of that determination, Mr. Pittman submits that a trier of fact could determine that Deputy Werner's and Sergeant Eaton's alleged failures to act on Mr. Pittman's alleged requests for CRISIS in the days leading to his suicide constituted deliberate indifference. He

---

[33] R.98 at 16–17.

notes that Deputy Werner and Sergeant Eaton admitted in their respective deposition testimony that, if events had happened as Banovz testified, their actions would have amounted to deliberate indifference. In Mr. Pittman's view, the severity of his difficulties should have been apparent to Deputy Werner and Sergeant Eaton based on his history in the jail and the circumstances of their interactions with him.

In evaluating this submission, we must accept the facts in the light most favorable to Mr. Pittman. We focus on whether Deputy Werner's and Sergeant Eaton's failure to act on Mr. Pittman's requests for CRISIS intervention meet the subjective component of deliberate indifference. Here, our prior case law is helpful to our analysis. *See Collins v. Seeman*, 462 F.3d 757 (7th Cir. 2006). In *Collins*, a suicidal inmate requested, but did not receive, crisis assistance. When told that assistance would not be immediate, the inmate stated that he "was all right and could wait" until help arrived. *Id.* at 759. During the interim, the staff checked in on him and informed him that assistance was coming soon, but he committed suicide before help arrived. *Id.* at 759–60. We held that the defendants who knew that he had requested crisis help, but did not know the reason for the request, were not deliberately indifferent. *Collins* stated, in relevant part:

> [Defendants] were aware that Collins had requested to see the crisis counselor, but they were not informed of the reason for the request. The undisputed facts of record indicate that inmates often request meetings with crisis counselors for reasons both serious and mundane, and sometimes make such requests as a means of manipulating prison

staff. Thus, a request to see a crisis counselor, stand-
ing alone, is not sufficient to put a defendant on
notice that an inmate poses a substantial and immi-
nent risk of suicide.

*Id.* at 761.

Given the pronouncements of *Collins*, the basic principles
that provide the framework for our decision are well estab-
lished. It is, of course, not sufficient that a prison official *should*
have been aware of a substantial risk of suicide. Rather, the
official must be aware of the facts from which the inference
could be drawn that there was a substantial risk of suicide and
must also draw that inference. Put more directly, the officer
must have been cognizant of the substantial risk that a prisoner
might take his own life.

A simple statement of this principle does not, of course,
resolve automatically every fact-bound situation in this
frequently encountered area. Fortunately, our earlier cases
provide not only firm articulations of the governing principle,
but also practical applications of it. For instance, our decision
in *Collins* makes clear that a prisoner's mere request to see a
psychiatric crisis counselor does not, *standing alone*, put a
prison officer on notice of the imminent possibility of suicide.
The record in that case, like the one in our present case,
demonstrated that prisoners ask to see such a counselor for
many reasons that are far removed from any possibility of
suicide.

Here, however, we must apply the principle of *Collins* to a
significantly different fact situation. Unlike the requests for
help in *Collins*, Mr. Pittman's alleged requests for CRISIS

assistance from Sergeant Eaton and Deputy Werner are not the only operative facts pertinent to our determination. The record in this case contains additional evidence that, when taken in the light most favorable to the nonmoving party, Mr. Pittman, creates a genuine issue of triable fact as to what the two officers knew at the time of their respective encounters with Mr. Pittman in the days immediately before his attempted suicide.

According to Mr. Pittman's cell neighbor, Banovz, Deputy Werner had ignored his warning that Mr. Pittman needed help. He also described Mr. Pittman as depressed at the time of the encounter and related that the officer told Mr. Pittman that his request could wait and that he would take care of it after the weekend on the following Monday. Banovz further related that no crisis counselor ever came. Similarly, Banovz asserted that, on the night before Pittman's suicide attempt, Sergeant Eaton had witnessed Mr. Pittman crying but then ignored Mr. Pittman's alleged request for CRISIS assistance the day before the suicide attempt. Banovz also said that Mr. Pittman related to the Sergeant the family problems that were the cause of his stress. In this case, therefore, unlike *Collins*, a third party, Banovz, testified that the officers wholly ignored Mr. Pittman's requests for CRISIS assistance and the other surrounding circumstances that indicated that he needed help.

The trier of fact could conclude reasonably that Sergeant Eaton had been aware that Mr. Pittman had cried intermittently for several hours on the day before his suicide attempt. The trier of fact also might conclude, reasonably, that the Sergeant's earlier interaction with Mr. Pittman gave him at

least some additional basis for an assessment that Mr. Pittman's psychiatric situation ought to be addressed seriously. On that earlier occasion on October 31, less than two months before Mr. Pittman's suicide attempt, Sergeant Eaton had supervised Mr. Pittman's temporary move to the male drunk tank for observation after Mr. Pittman had been crying and had stated that he needed to be moved from his regular housing. Similarly, a trier of fact might conclude, reasonably, that Deputy Werner had ignored a warning from Mr. Pittman's cell neighbor, Banovz, that Mr. Pittman "need[ed] help."[34] The trier of fact also might conclude that Deputy Werner's earlier interaction with Mr. Pittman, a few months before the suicide attempt, gave him an additional basis to assess Mr. Pittman's psychiatric situation. At that time, Mr. Pittman had been placed on suicide watch, and Deputy Werner had noted during a night shift that he planned to refer Mr. Pittman to a social worker in the morning, but had decided not to call CRISIS to see him immediately.

The record also reflects that, while claiming no recollection of any encounter with Mr. Pittman in the time immediately before his suicide attempt, the officers admit in their deposition testimony that, had such encounters taken place, they would have been obliged, under the extant jail procedures, to refer Mr. Pittman to the CRISIS worker for further assessment since neither of them had the background necessary to assess definitively the gravity of Mr. Pittman's psychiatric condition. There were no such referrals. In short, the officers admit that the failure to make such a referral would have amounted to an

---

[34] R.60-3 at 8.

abnegation of their responsibility to refer prisoners with manifestations of serious psychiatric crisis for further assessment. Indeed, other supervisory prison officers testified that such a failure would have amounted to a serious breach of duty.

When an inmate presents an officer with a request to see a crisis intervention person and the officer also is aware that the reason for the request well may be a serious psychological condition that is beyond the officer's capacity to assess definitively, the officer has an obligation to refer that individual to the person who, under existing prison procedures, is charged with making that definitive assessment. The danger of serious consequences, including death, is obvious. Whether such encounters occurred here are questions that must be resolved by the trier of fact. They cannot be determined on summary judgment. Accordingly, this portion of the district court's judgment must be reversed and remanded for further proceedings.

## 2.

Mr. Pittman also contends that Nurse Unfried and Dr. Blankenship should have monitored him more closely and that the medical program they ran was "constitutionally impaired."[35]

In evaluating these allegations, we again must keep in mind that, under established precedent, the Due Process Clause does

---

[35] Appellant's Br. 45.

not protect a detainee from the negligence or even the gross negligence of prison medical personnel. *See Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003). Such matters are the subject of state tort law. Therefore, even if the defendants *should* have been aware of Mr. Pittman's risk of suicide, such a showing would not sustain a cause of action based on the Due Process Clause. By contrast, deliberate indifference requires a showing that the defendants had *actual* knowledge that Mr. Pittman was at risk of serious harm and *deliberately ignored* that risk. *See Collins*, 462 F.3d at 761. The record here will not support the conclusion, even by inference, that Nurse Unfried and Dr. Blankenship addressed Mr. Pittman's situation with such a mental state. *Cf. Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013) (determining that nurse manager was not liable because there was no evidence that she knew that detainee was suicidal when she treated her for panic attacks and anxiety). *But see id.* at 981–82 (concluding that jury could find that jail social worker who did not report or treat suicidal detainee's depression, hallucinations, acute anxiety and feelings of hopelessness or recommend suicide watch was deliberately indifferent to risk of suicide).

Mr. Pittman presents a list of complaints about Nurse Unfried and Dr. Blankenship and jail medical practices. A review of the record establishes, however, that their attention to his complaints cannot be characterized reasonably as the deliberate indifference required to establish a violation of the Due Process Clause. These professional caregivers addressed Mr. Pittman's complaints and prescribed medication. Although Mr. Pittman contends that he should have been reassessed after being prescribed Prozac, the record does not

indicate that Mr. Pittman communicated problems related to his prescription for Prozac to Nurse Unfried or Dr. Blankenship.

Mr. Pittman also contends that Nurse Unfried and Dr. Blankenship should have monitored him more closely. Here again, however, the record will not support a conclusion that their attention to him was marked by deliberate indifference. The medical department worked as an integral part of the jail facility. Although they supported the jail's overall mission by supplying medical care to the inmates, they also relied, to a significant extent, on those with daily custodial responsibilities to refer to them inmates whose conditions required their ministrations.

### 3.

We now address Mr. Pittman's contention that the district court erred in granting summary judgment in favor of Sheriff Hertz and Captain Gulash because the suicide prevention policies at the jail were so deficient as to constitute deliberate indifference. In Mr. Pittman's view, the medical department's practices and policies were inadequate and there was inadequate communication and training about suicide prevention in the jail. He submits that the thirty-six suicide attempts and three successful suicides at the jail from 2005 to 2010 demonstrate the obvious inadequacy of the jail's suicide prevention

efforts and that those inadequacies "were the moving force behind" his suicide attempt.[36]

We cannot accept this submission. The record cannot support the conclusion that Sheriff Hertz and Captain Gulash were deliberately indifferent; a jury could not conclude reasonably that these defendants had the requisite subjective awareness needed for a deliberate indifference claim. Nothing in the record suggests that Sheriff Hertz or Captain Gulash knew that Mr. Pittman faced a "significant likelihood" that he would "imminently seek to take his own life." *Collins*, 462 F.3d at 761 (citing *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000)).[37]

With respect to Sheriff Hertz, there is no evidence indicating that he had any direct contact with Mr. Pittman or knew about specific risks to him when formulating any jail policy or giving any direction as to the operation of the jail. Indeed, the record contains no evidence that Sheriff Hertz knew that Mr. Pittman was suicidal or even that he faced mental health issues. Captain Gulash similarly lacked the subjective awareness of a substantial risk to Mr. Pittman. The record does not reflect that Captain Gulash interacted with Mr. Pittman during the week of his suicide, nor that he was notified of Mr. Pittman's need for mental health services. Summary

---

[36] *Id.* at 28.

[37] An individual supervisor cannot be held liable under § 1983 simply on the theory of respondeat superior. *See, e.g., T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010).

judgment was proper as to each of these defendants in their individual capacities.

We turn now to Mr. Pittman's claims against the county and against Sheriff Hertz in his official capacity. A government entity violates the Due Process Clause only if it maintains a policy or custom that infringes upon the rights protected by that clause. *See Estate of Novack*, 226 F.3d at 530–31. To avoid summary judgment with respect to these claims, a plaintiff also must demonstrate that a genuine issue of material fact exists as to whether his suicide attempt was proximately caused by "either an official policy of the municipality or from a governmental custom or usage." *Sams v. City of Milwaukee, Wis.*, 117 F.3d 991, 994 (7th Cir. 1997) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978)).

Mr. Pittman submits that the jail's suicide prevention policies and practices were so inadequate that they constitute a constitutional violation. In evaluating this claim, we begin by noting that we have recognized in earlier cases that the "existence or possibility of other better policies which might have been used does not necessarily mean that the defendant was being deliberately indifferent." *Frake v. City of Chi.*, 210 F.3d 779, 782 (7th Cir. 2000); *cf. Belbachir*, 726 F.3d at 983. Here, the jail provided written suicide prevention policies to officers and those officers received annual training. Mr. Pittman points to no particular deficiency in those policies or in the training regime of the facility. Nor can the fact that the jail experienced thirty-six suicide attempts and three successful suicides—standing alone—evidence that the jail's policies are inadequate. The bare fact that other inmates attempted suicide does not demonstrate that the jail's policies were inadequate,

that officials were aware of any suicide risk posed by the policies or that officials failed to take appropriate steps to protect Mr. Pittman. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (refusing to adopt "bright-line rules defining a 'widespread custom or practice'" and emphasizing that the plaintiff must "demonstrate that there is a policy at issue rather than a random event"). Nor does the mere fact that the trained prison custodial personnel followed a widespread practice of exercising individual discretion in determining when and how to seek mental health services for inmates and detainees, standing alone, establish that such a practice was a clear constitutional violation. The record does not disclose that the number of attempted suicides and successful attempts required a reevaluation of existing policies or the retraining of jail personnel. Notably, the existing policies provided that jail officials were to respond to inmates' and detainees' signs of distress. Mr. Pittman certainly has not met his burden of showing that a failure to take remedial measures was necessary in order to meet constitutional standards.

Mr. Pittman's deliberate indifference claims against Madison County, Sheriff Hertz and Captain Gulash were properly dismissed at summary judgment.

**4.**

Finally, Mr. Pittman contends that the district court erred in granting summary judgment for Madison County and Captain Gulash on his Illinois state law claims. As the district court recognized, Illinois law provides that a public employee is not liable "for injury proximately caused by the failure of the

employee to furnish or obtain medical care for a prisoner in his custody" unless "the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care." 745 ILCS 10/4-105. The willful and wanton standard is "remarkably similar to the deliberate indifference standard." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (internal quotation marks omitted). Accordingly, if Deputy Werner or Sergeant Eaton is determined to have been deliberately indifferent to the immediate medical needs of Mr. Pittman, the district court also will have to address the liability of these individuals under state law as well as the vicarious liability of Sheriff Hertz and the County under state law.[38, 39] *Id.* at 405.

---

[38] We note that Banovz testified that he told an unnamed guard that Mr. Pittman "was having some real problems and you better get keep [sic] an eye on him before he tries something suicidal." R.78-2 at 27. Banovz testified at his deposition that he could not recall the identity of the officer he warned. *Id.* He did state during his interview the night of the suicide attempt that he had told Deputy Werner at some point that Mr. Pittman "need[ed] help." R.60-3 at 8. Banovz testified at his deposition, however, that he did not remember the officer's identity and was "sure [the officer is] not going to remember either." R.78-2 at 27. In *Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007), we noted that the inability to identify the employee who violated the rights of the plaintiff does not necessarily absolve the municipality and its officers from liability for the established actions of the unidentified employee. We wrote:

> Under Illinois law, "it is sufficient for recovery against a public entity to prove that an identified employee would

(continued...)

## Conclusion

Because Mr. Pittman raised a genuine issue of triable fact about whether Deputy Werner and Sergeant Eaton exhibited deliberate indifference toward him, summary judgment should have been denied as to those defendants. We agree that summary judgment was entered properly with respect to the other defendants, except for any liability that the County or the Sheriff may incur under state law for the actions of their

---

[38] (...continued)
> be liable even though that employee is not named a defendant in the action." *Gordon v. Degelmann*, 29 F.3d 295, 299 (7th Cir. 1994) (quoting *McCottrell v. Chicago*, 135 Ill. App. 3d 517, 90 Ill. Dec. 258, 481 N.E.2d 1058, 1060 (1985)). In *Gordon*, this court surmised that an unnamed officer assisting in an arrest was sufficiently identified for purposes of holding the municipality liable for his actions, before determining that this officer's actions were not willful or wanton. *Id.*

*Rodriguez*, 509 F.3d at 405.

We note that, although Mr. Pittman brought a state law claim against Captain Gulash, he does not argue on appeal that the district court erred in granting summary judgment on that count. Accordingly, his possible vicarious liability is not before us today and may not be revisited by the district court on remand.

[39] Mr. Pittman also submits that the district court erred in denying his request for injunctive relief. Injunctive relief under § 1983 is proper only when there is a continuing violation of federal law. *Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 894 (7th Cir. 2012); *see also Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991). For the reasons explained in Part A, we affirm the denial of injunctive relief because there is no evidence of a continuing violation of federal law.

subordinates. Accordingly, we affirm in part and reverse in part the judgment of the district court. The case is remanded for further proceedings consistent with this opinion. The parties shall bear their own costs in this appeal.


AFFIRMED in part and
REVERSED in part and REMANDED