In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3207

PAUL HESTER,

*Plaintiff-Appellant*,

*v.*

INDIANA STATE DEPARTMENT OF
HEALTH,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:10-cv-1570-JMS-DML — **Jane E. Magnus-Stinson**, *Judge.*

ARGUED JUNE 6, 2013 — DECIDED AUGUST 9, 2013

Before POSNER, ROVNER, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Until mid-2009, Paul Hester was
employed by the Indiana State Department of Health (the
Department). The Department was not satisfied with Hester's
work, however, and so it terminated his employment. Hester
believes that this action was motivated by his gender, race, or
age. Initially, he sued the Department in Indiana state court,

alleging violations of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, and Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2000e17, but the Department removed the action to federal court. The district court granted summary judgment for the Department on all claims. It concluded that Indiana was immune from liability for private damages under the ADEA, and it found that Hester had failed to identify enough evidence to permit a trier of fact to find that the Department discharged Hester because of a protected characteristic.

We agree with the district court that Hester's evidence could not support a finding that the Department's action was motivated by race or gender. Hester conceded at oral argument in this court that the record contains no more evidence of age discrimination than of race or gender bias. His age-based claim has thus dropped out of the case. This means that we have no occasion to delve into the interesting questions of sovereign immunity that have occupied the parties in their briefing, although we outline them briefly.

**I**

Hester (who is white, male, and at the time he lost his job, in his mid-50s) began working as a microbiologist at the Department's immunology laboratory in 1994. It appears that his tenure was uneventful until 2007, when he was reprimanded for failing to report test results on time. Later that year, Hester applied for the position of Bench Supervisor. Lixia Liu interviewed him for that slot, but in the end she chose Rich DuFour, another white male, for the job. In 2008, Hester told DuFour (then his supervisor) that the lab was using an in-

correct procedure for syphilis tests. (Hester thought that the lab should be using a "moistened chamber" for conducting the tests, and it was not doing so.) While DuFour did not respond directly to Hester's complaint, it appears that the Department has since modified its standard operating procedure and now follows the protocol Hester had identified.

At the end of 2008, DuFour left the position of Bench Supervisor. Hester again applied for the position and was again interviewed for it by Liu. This time Liu awarded the position to a white female in her mid-twenties, Jessica Gentry, who had been working in the lab for four years. Liu explained that she chose Gentry for several reasons: Gentry was one of the top performers in the lab; Liu had more confidence that Gentry's test results would be returned on time; and Liu was concerned that Hester did not have a good working relationship with other employees.

In April 2009, Hester's supervisors met with him for a performance appraisal, at which he received a document entitled "Work Improvement Plan, Notice of Substandard Performance." The form listed a number of Hester's "performance deficiencies." In particular, it said, he "[did] not meet expectations"; he "need[ed] improvement" in "job knowledge"; and he had "competency in only one of four testing areas … due to hesitance in cross-training." It recommended that Hester "work to improve knowledge retention and putting new knowledge into routine use," develop "more thorough understanding of instruments … and … use of [standard operating procedures]," and "embrace more opportunities for learning and … attain[] knowledge related to daily functions." Hester was also reminded that he had failed to

satisfy the Department's request that he attend training to gain proficiency in hepatitis C and syphilis testing.

The Work Improvement Plan required Hester to demonstrate perfect accuracy in syphilis and Ortho ECi testing within 30 days, or else he would face termination. (Ortho ECi is a proprietary immunodiagnostic system. See http://www.orthoclinical.com/en-us/ localehome/whoweare/Pages/OverviewHistory.aspx (last visited Aug. 8, 2013).) In May 2009, Hester passed the syphilis examination, but he recorded one sample on the Ortho ECi test inaccurately. A second performance appraisal report for the period between April 24 and May 24, 2009, found that Hester did not meet expectations in the areas of "job knowledge" and "communication." That report noted that Hester failed satisfactorily to complete the Ortho ECi testing "despite the fact that he was given extensive hands-on training[,] … much longer and more extensive training than anyone else in the Serology Lab required." It also noted he "displayed a reluctance to read or consult the written test procedures, and he refused to take notes or write down many key facts that he seemed to have a difficult time remembering." When he was instructed to take notes, he refused to do so because he did not want them to become a "crutch." On June 9, the Department provided Hester with a 30-day notice of the termination of his job.

Hester was a merit employee, and under state law he could be fired only for just cause. The State Employees Appeals Commission (SEAC) rejected Hester's challenge to the Department's action. He appealed to the Marion  Superior Court, which initially remanded Hester's case, instructing SEAC to

correct evidentiary and procedural errors in the proceeding. The Department filed a motion addressing these errors, and the Superior Court suspended the remand pending its decision on that motion. These proceedings were ongoing at the time of the district court's decision.

Meanwhile, Hester filed this parallel suit in state court alleging that the Department's decision not to promote him to Bench Supervisor and to fire him violated Title VII and the ADEA. The Department removed the suit to federal court. In granting summary judgment for the Department, the district court held that Indiana was immune from suit under the ADEA pursuant to *Kimel v. Florida Board of Regents*, 528 U.S. 62 (2000). The court found that Indiana waived its immunity from suit by removing the case to federal court, but it found that the state could nonetheless assert immunity from liability in a private damages claim under the ADEA, as the state would have been immune from a comparable claim in state court. The court also concluded that Hester's suit could not survive summary judgment in any event, because he lacked evidence that race or gender, rather than shortcomings in performance, motivated the Department's decisions. Even if the Department were mistaken in believing that it had cause to discharge Hester on competency grounds, that type of complaint is properly addressed through the wrongful termination proceedings ongoing in state court; it says nothing about unlawful discrimination once pretext is ruled out.

## II

### A

We review the district court's grant of summary judgment *de novo*, construing all evidence in the light most favorable to Hester. We will affirm if there are no genuine issues of material fact and, on the basis of the uncontested facts, the Department is entitled to judgment as a matter of law. Finally, "summary judgment may be granted based on any ground that finds support in the record, so long as the non-moving party had an opportunity to submit affidavits or other evidence and contest the issue." *William v. U. S. Steel*, 70 F.3d 944, 947 (7th Cir. 1995); see also *Stanley v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) ("[A]n appellate court can affirm the district court's dismissal based on any ground supported by the record, even if different from the grounds relied upon by the district court.").

### B

Rather than beginning with the Department's sovereign immunity defense, as the district court did, we proceed directly to the points that we believe resolve this appeal in the most straightforward manner. We are entitled to do so because the state's sovereign immunity does not automatically destroy the subject-matter jurisdiction of the federal courts, particularly in a case (such as ours) that does not rest on diversity jurisdiction. See *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998). In order to move beyond summary judgment on his discrimination claims, Hester had to submit evidence showing that the Department's adverse actions were motivated by his gender, race, or age, rather than his unsatisfactory performance. "[T]he

plaintiff one way or the other must present evidence showing that … a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason." *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring); *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999) (age discrimination claim); *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 674-75 (7th Cir. 2012) (race discrimination claim). We consider first his allegations of race or gender discrimination.

Hester may prove this by evidence, direct or circumstantial, that would allow a trier of fact to find that he was in a protected group, that he suffered an adverse employment action, and that the adverse action was caused by his protected status. In the alternative, he may use the well-worn "indirect," burden-shifting method of proof recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which the plaintiff first establishes a *prima facie* case of discrimination, the employer responds by articulating a legitimate, nondiscriminatory reason for its action, and the plaintiff then has the opportunity to show that the employer's explanation is pretextual. See *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 & n.3 (2003). If the plaintiff is not using the burden-shifting approach, however, then he is entitled to present any evidence he can muster to show that discrimination was the reason for the adverse action. An outright confession of discriminatory intent would suffice, but outside the world of fiction, one does not ordinarily see that kind of evidence. Short of that, examples of pertinent circumstantial evidence include suspicious timing, ambiguous statements or behavior directed at others in the

protected group; and evidence that similarly situated employ-ees outside the protected class were treated more favorably. *Good*, 673 F.3d at 675, 678.

Hester has not presented any evidence, no matter how characterized, that would cast doubt on the Department's decision not to promote him. His supervisors never mentioned either his race or his gender. This case is thus not like *Pitasi*, where the employer asked the employee "[w]hat would you think if we gave you early retirement, with some extra com-pensation because of your age?" 184 F.3d at 713. Nor was there a pattern of the Department's disfavoring males for the position of Bench Supervisor. Compare *Mills v. Health Care Serv. Corp.,* 171 F.3d 450, 457 (7th Cir. 1999) ("Between 1988-1995, nearly all promotions at the office went to women, and at the time the challenged hiring decision was made, females dominated the supervisory positions in the relevant office."). To the contrary, the first time Hester applied for the position of Bench Supervisor, Liu gave the position to DuFour, another white male. Over the period in question, one man and one woman were promoted to the Bench Supervisor position. This shows gender balance, not gender bias.

As we noted earlier, Liu gave three neutral reasons for her decision to promote Gentry over Hester: Gentry performed her work in a timely manner; Gentry was a top performer; and Gentry got along better with other workers in the lab. None of those things could have been said about Hester. To the contrary, he was disciplined in 2007 for failing to submit a sample in time; his Work Improvement Plan reveals that the Department did not regard him as a "top performer"; and Hester's performance evaluation states that he fell short of

expectations in communication because he did not follow directions well. Hester has provided no reason for suspecting that these negative assessments were pretextual.

Hester's effort to defeat summary judgment on his termination claim fares no better. Hester argues that three allegations in his affidavit would (if believed by the trier of fact) demonstrate that the Department subjected him to disparate treatment based on his race or gender: (1) a male African-American employee, Douglas, had "serious performance deficiencies," but Douglas was reassigned rather than fired; (2) Gentry and four other female employees performed syphilis testing improperly, but the women were not fired or disciplined; and (3) another female employee, Espinosa, was permitted to retake the Ortho ECi test when she failed it, rather than being fired. (The district court excluded the last allegation from evidence because Hester failed to show that he had personal knowledge about Espinosa's situation and the evidence lacked foundation, including information about when Espinosa's failure and retake occurred. We mention it only because it would not have helped Hester even if the district court had taken it into account.)

Even if all of Hester's evidence were credited, it does not add up to a showing that he was treated differently because of his race or gender. None of these employees was comparable to him. None was placed on a Work Improvement Plan after unsatisfactory performance. None was required to pass an examination with 100% accuracy in order to remain employed. And none failed the test despite this condition. Hester suggests that employees who improperly conducted syphilis tests were comparable because they too made mistakes, yet the Depart-

ment treated them more favorably because it did not fire them. But the Department explains that all employees at one point conducted syphilis tests "incorrectly" pursuant to its former operating procedure, which did not involve the use of a moistened chamber. During the time when the five female employees performed syphilis tests improperly, the entire lab, including Hester, was doing the same thing. Since they were complying with the operating procedure in place at the time, the employees who incorrectly performed syphilis tests are not similarly situated to Hester. Only Hester continued to have performance problems so serious that the Department deemed his work unsatisfactory.

To support an inference that the Department treated similarly situated employees of a different race or gender more favorably, Hester needed evidence that employees of a different race or gender were put on a "Work Improvement Plan" with the same terms as Hester's, but allowed to continue working after failing one of the tests. He could also have shown that employees of a different race or gender received notices of unsatisfactory performance similar to Hester's, but were not placed on a "Work Improvement Plan." Hester did none of these things.

The fact that Douglas, an African-American male over the age of 50 who had been with the Department for 50 years, was not let go for poor performance cuts against Hester's allegations of age and gender discrimination. One would expect Douglas to have been fired if the Department were biased against male (or older) employees. Similarly, that the Department treated Gentry and several other white employees favorably undermines Hester's claim of race discrimination.

Hester finally urges that his firing must have been attribut-able to forbidden reasons because (he says) the Department mistakenly concluded that he failed the Ortho ECi exam. Indeed, he charges, Gentry fabricated his failure of the Ortho ECi exam and withheld information that would allow him to show he actually passed it. Even if this were so, and even if the Department was wrong in determining that Hester performed unsatisfactorily, nothing in this account points to discrimina-tion as the real reason for the Department's action. Gentry and other supervisors may have treated Hester poorly out of personal animosity. That might violate the state's law prohibit-ing merit employees from being terminated without "just cause," but it does not leave gender or race as the only alterna-tive explanation.

The district court thus properly concluded that Hester's evidence was insufficient to survive summary judgment on his claims of race and gender discrimination. While that court did not rule on the sufficiency of the age discrimination evidence, at oral argument Hester's counsel admitted that there is no more evidence that the Department was motivated by age than the evidence we have described here. Hester's ADEA claim could have been dismissed just as readily on the evidentiary shortcomings that prevent Hester's Title VII claims from going forward, and that ground is available to this court on our *de novo* review of the judgment.

## C

Before concluding, we offer a few remarks about the elephant in the room: the district court's sovereign immunity ruling. As we noted earlier, the court found that by removing

the case from the state court, the Department waived its immunity from suit, but not its immunity from damages liability under the ADEA. This implicates a question that we have not yet had occasion to answer, and that has divided our sister circuits: Does a state waive the immunity it would have in state court by removing a suit to federal court? In *Lapides v. Board of Regents of University System of Georgia*, 535 U.S. 613 (2002), the Supreme Court held that by removing the case to federal court, the state of Georgia waived immunity in a federal forum from state law claims from which it would *not* have been immune had the case stayed in state court. The Court stated that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum." *Id.* at 624. The Court emphasized its concern that the state would gain an unfair advantage by removing to federal court if it could declare immunity in a federal forum that it would not have in state court.

The courts of appeals have interpreted *Lapides* differently: at least one court has read *Lapides* as suggesting that by removing to federal court, a state waives *any* immunity that it would have had in state court. *Estes v. Wyo. Dep't of Transp.*, 302 F.3d 1200, 1206 & n.1 (10th Cir. 2002) (holding that the state waived immunity from suit under the Americans with Disabilities Act (ADA) even though the state would have been immune from the claim in state court). Other circuits have read *Lapides* as holding that, by removing to federal court, a state waives only its immunity from the jurisdiction of the federal forum, but it retains immunity as a defense to liability to the extent the defense would be available in state court. *Stroud v.*

*McIntosh*, No. 12-10436, 2013 WL 3790961 (11th Cir. July 23, 2013) ("We do not understand *Lapides* to require the state to forfeit an affirmative defense to liability simply because it changes forums. But the *Lapides* Court's reasoning supports the propositions that a state consents to federal jurisdiction over a case by removing and that it cannot then challenge that jurisdiction by asserting its immunity from a federal forum."); *Lombardo v. Pa. Dep't of Pub. Welfare*, 540 F.3d 190, 198 (3d Cir. 2008) ("We hold that while voluntary removal waives a State's immunity from suit in a federal forum, the removing State retains all defenses it would have enjoyed had the matter been litigated in state court, including immunity from liability."); *Meyers ex rel. Benzing v. Texas,* 410 F.3d 236, 255 (5th Cir. 2005) ("[W]hen Texas removed this case to federal court it voluntarily invoked the jurisdiction of the federal courts and waived its immunity from suit in federal court. Whether Texas has retained a separate immunity from liability is an issue that must be decided according to that state's law." (citation omitted)).

Several other courts have reached the same result by slightly different reasoning. These decisions hold that waiver-by-removal occurs only if, as in *Lapides,* the removing state stands to gain an unfair advantage by asserting immunity that it would not have enjoyed in its state courts. *Bergemann v. R.I. Dep't of Envtl. Mgmt.*, 665 F.3d 336, 342 (1st Cir. 2011) ("Rhode Island's sovereign immunity defense is equally as robust in both the state and federal court. Consequently, there is nothing unfair about allowing the state to raise its immunity defense in the federal court after having removed the action. Simply put, removal did not change the level of the playing field."); *Stewart*

*v. North Carolina*, 393 F.3d 484, 490 (4th Cir. 2005) ("North Carolina had not consented to suit in its own courts for the relevant claims … . Therefore, by removing the case to federal court and then invoking sovereign immunity, North Carolina did not seek to *regain* immunity that it had abandoned previously. Instead, North Carolina merely sought to have the sovereign immunity issue resolved by a federal court rather than a state court."(citations omitted) (emphasis in original)).

The closest we have come to addressing this question is our holding that, by filing suit in federal court based on federal copyright law, Wisconsin waived immunity to the defendant's counterclaims under the same federal law, even though it would ordinarily be immune from suit in federal court. *Bd. of Regents of the Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448 (7th Cir. 2011). *Phoenix,* however, does not answer the question we are discussing, because there we said nothing about whether the state would have been immune from the copyright claims in state court, nor did we address how this hypothetical state-court immunity would affect immunity in federal court. Since Wisconsin was the plaintiff asserting federal claims in federal court, albeit in an appeal from a federal agency decision, there was no need to reach those issues.

The case for waiver is significantly different here because Indiana was the defendant and in no way invoked federal law as a basis for any claims. The Department explains that it removed Hester's suit because it prefers to defend Title VII actions (which, because they rest on Section 5 of the Fourteenth Amendment, validly abrogate immunity, see *Fitzpatrick v.*

*Bitzer,* 427 U.S. 445 (1976)) in federal court, and it wanted to litigate those claims even while it asserted its immunity defense from ADEA liability pursuant to *Kimel.*

*Kimel* held that Congress was not empowered by the Fourteenth Amendment to subject the states to suits for private damages based on age discrimination. The Indiana Supreme Court has held that there is no private civil damages remedy under Indiana's state Age Discrimination Act, Ind. Code § 22-9-2-1, and thus (in that court's view) Indiana is under no obligation to recognize comparable claims under the federal ADEA. *Montgomery v. Bd. of Trustees of Purdue Univ.,* 849 N.E.2d 1120 (Ind. 2006). Compare *Erickson v. Bd. of Governors of State Coll. & Univ.,* 207 F.3d 945, 952 (7th Cir. 2000) (Illinois did open its courts to claims based on state law, including a prohibition against disability discrimination, and so state courts could not exclude such claims based on federal law).

These cases raise a number of interesting questions: is it correct to distinguish between immunity from suit and immunity from a forum? May a state court, consistently with *Testa v. Katt,* 330 U.S. 386 (1947), refuse to entertain a case based on federal law when the state has an analogous statute that differs only in the remedies afforded? Are the rules different when the state freely chooses the federal forum by removing? What if the state not only removes, but it files a counterclaim? To the extent that Hester might have been seeking injunctive relief, did the district court act too hastily in assuming that Indiana's sovereign immunity would also bar that aspect of his case, despite *Ex parte Young,* 209 U.S. 123 (1908)? Rather than plunge into those delicate topics in a case

where the answers ultimately do not matter, we are content to save them for another day.

* * *

We AFFIRM the judgment of the district court.