In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 13-1857

ADAM A. LOCKE,

*Plaintiff-Appellee,*

*v.*

MYA HAESSIG,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 10-CV-430-JPS—**J.P. Stadtmueller**, *Judge.*

---

ARGUED OCTOBER 31, 2014 — DECIDED JUNE 5, 2015

---

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff Adam Locke sued defendant Mya Haessig, a state official, under 42 U.S.C. § 1983 for violating the Equal Protection Clause of the Fourteenth Amendment. Locke alleges Haessig is liable because of how she responded to his complaint that her subordinate, a parole officer, was sexually harassing Locke, a parolee. Locke

has provided evidence that Haessig was told of the harassment, failed to intervene or investigate, and then threatened to retaliate against Locke for complaining.

The district court denied Haessig's motion for summary judgment on the basis of qualified immunity. Haessig brought this interlocutory appeal, arguing that even Locke's version of the facts shows that she lacked the required intent to discriminate. Haessig contends that because the facts show only that she failed to intervene to stop her subordinate from sexually harassing Locke, she could not have intended to discriminate and therefore could not have violated the Equal Protection Clause as a matter of law.

We affirm the denial of qualified immunity. Accepting Locke's version of the facts, we conclude that a reasonable jury could return a verdict for Locke. Haessig was told of Locke's complaints of sexual harassment but never met with him to discuss the allegations or tried to protect him from further harassment. According to Locke, after hearing of his complaint, Haessig expressed anger toward Locke and said he would never get off of his electronic ankle monitor until he was discharged from parole. A reasonable jury could infer from these facts—which show not only a failure to intervene but also a threat of retaliation in response to the complaint— that Haessig was acting with the intent to discriminate. This is sufficient for liability under current law and was clearly established law in 2008 when these events took place. Haessig had reasonable notice that her alleged actions were unlawful and so is not entitled to qualified immunity.

I.  *Factual and Procedural History*

Because this is an interlocutory appeal from the district court's denial of qualified immunity, we have appellate jurisdiction over only legal questions. *Whitlock v. Brueggemann*, 682 F.3d 567, 573 (7th Cir. 2012). We do not have jurisdiction to consider record issues such as whether the record sets forth a genuine issue of fact for trial. *Johnson v. Jones*, 515 U.S. 304, 313 (1995) (district court's determination that summary judgment record raised a genuine issue of fact concerning defendants' involvement in the alleged beating of plaintiff "was not a 'final decision' within the meaning of the relevant statute"); *Whitlock*, 682 F.3d at 573.

For purposes of this appeal, then, we accept the district court's account of plaintiff's version of the facts to frame our review of the purely legal question presented: whether a reasonable jury could infer from Haessig's alleged actions that she had the intent to discriminate on the basis of sex. See, e.g., *White v. Gerardot*, 509 F.3d 829, 833 (7th Cir. 2007) (appellate court may look to the plaintiff's version of the facts or the facts the district court assumed as the source of undisputed facts for a qualified immunity appeal).[1]

---

[1] Locke's version of events is drawn from several documents that he submitted when he was representing himself in the district court. We draw some of these facts from his complaint, which "is the equivalent of an affidavit for summary judgment purposes" because he verified it under penalty of perjury. See, e.g., *Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013). We also rely on facts in his memorandum opposing summary judgment that he swore to under penalty of perjury and were based on his personal knowledge. See *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (pro se filings should be "liberally construed"). Final-

A.  *Locke's Complaint of Sexual Harassment*

Plaintiff Adam Locke was under the supervision of the Wisconsin Department of Corrections from 2007 to 2009, some of the time as a prisoner in custody and some of the time as a parolee. Locke's primary parole agent during this period was Wendy Schwartz, but another agent, defendant Anthony Flores, occasionally filled in for Schwartz. Flores sexually harassed Locke while supervising his parole from May 2007 to the summer of 2009. Flores propositioned Locke for sex, made unwanted physical advances, and offered to release him from electronic monitoring if he would allow Flores to take nude photos of him.

Locke complained to Agent Schwartz about the harassment when she visited him in jail sometime between December 2007 and February 2008. Schwartz told her supervisor, defendant Mya Haessig, about Locke's complaint. Haessig in turn called the regional office and told a regional chief about the complaint. The regional chief directed Haessig to have Agent Schwartz obtain a written statement from Locke.

Neither Haessig nor Schwartz ever followed up with Locke to obtain a written statement. Haessig took no further action to address the complaint of sexual harassment. Haessig had the authority to transfer Locke to another facility away from Flores but did not do so. Haessig never documented the complaint in Locke's DOC file.[2]

---

ly, we supplement these facts with those facts contained in Haessig's affidavit and responses to interrogatories that Locke does not dispute.

[2] Haessig contends that she spoke with Locke about the complaint and that he told her he did not want to file a formal complaint or talk

Flores heard about Locke's complaint, probably from Agent Schwartz. Flores called Locke into his office and told him to be careful about what he said and to whom he said it. Flores continued to harass Locke sexually. After Locke had complained about harassment, Haessig was irritated with and negative toward him. Haessig told Locke he would never be released from his ankle monitor until he was discharged from parole. Agent Schwartz acknowledged to Locke that Haessig was targeting him for harassment.

Flores's harassment of Locke finally ended in the summer of 2009 when the Federal Bureau of Investigation investigated Flores in response to complaints from several other parolees. Haessig did not play a significant role in that investigation. Flores resigned from office in June 2010 in the midst of investigation.

B. *Procedural History*

Locke filed suit pro se against Flores in May 2010. The district court screened the complaint and found that it plausibly alleged that a state employee had sexually harassed Locke in violation of the Equal Protection Clause. Flores was served with the complaint but never appeared. The clerk of the court has entered a default against Flores, and the district court has said it intends to enter a default judgment against Flores after Locke has an opportunity to prove the amount of his damages.

---

about the incident any further. In this appeal from a denial of summary judgment based on qualified immunity, we must accept as true Locke's sworn statement that neither Haessig nor Schwartz ever spoke with him about the sexual harassment after his initial complaint. See *White*, 509 F.3d at 833.

The district court then allowed Locke to amend his complaint to add Haessig as a defendant. Locke also added two new claims against both Flores and Haessig, alleging that Flores's sexual harassment and Haessig's inadequate response amounted to cruel and unusual punishment in violation of the Eighth Amendment and a denial of substantive due process in violation of the Fourteenth Amendment. Haessig's motion for summary judgment on the equal protection claim based on qualified immunity was denied, and this interlocutory appeal followed.

II. *Analysis*

We review *de novo* a district court's denial of summary judgment based on qualified immunity. *Levin v. Madigan*, 692 F.3d 607, 622 (7th Cir. 2012). We can affirm on any ground supported by the record so long as the issue was raised and the non-moving party had a fair opportunity to contest the issue in the district court. *Hester v. Indiana State Dep't of Health*, 726 F.3d 942, 946 (7th Cir. 2013); *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005).

The defense of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating whether a state actor is entitled to summary judgment for qualified immunity, we consider (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Gonzalez v. City of Elgin*, 578 F.3d 526,

540 (7th Cir. 2009), citing *Pearson*, 555 U.S. at 232, and *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

We may address the two prongs of the qualified immunity inquiry in whichever order seems better for the case. See *Whitlock v. Brueggemann*, 682 F.3d at 580. Here we take the unusual step of beginning with the second prong because our discussion of the state of the law in 2007 and 2008 provides helpful context for analysis of later developments in the law.

A. *Clearly Established Law in 2007 and 2008*

If we accept the facts asserted by Locke, Haessig's actions violated clearly established law at time of the violation. In 2007 and 2008, when the events took place, it was well established that sexual harassment by a state actor under color of state law violated the Equal Protection Clause and was actionable under § 1983. *Valentine v. City of Chicago*, 452 F.3d 670, 682 (7th Cir. 2006); *Bohen v. City of East Chicago*, 799 F.2d 1180, 1185–86 (7th Cir. 1986). It was also clear that a supervisor could be held liable for a subordinate's sexual harassment if the plaintiff could show either intentional sex discrimination or a conscious failure to protect the plaintiff from abusive conditions created by subordinates amounting to intentional discrimination. *Valentine*, 452 F.3d at 683–84; *Bohen*, 799 F.2d at 1187; see also *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) ("At the time of the events at issue in this litigation [from 2001 to 2005], it was clearly established in this circuit that a supervisor could be held liable for participating in or deliberately turning a blind eye to the equal protection violation of her subordinate.").

By 2007, we had recognized that males who were sexually harassed could bring equal protection claims if they could show intentional discrimination on the basis of their sex. We reversed a grant of summary judgment where a male plaintiff presented evidence that school officials ignored his complaints of sexual harassment by male classmates but consistently punished the harassers when similar complaints were made by girls. *Nabozny v. Podlesny*, 92 F.3d 446, 454–56 (7th Cir. 1996).

It was also well established in 2007 and 2008, however, that a supervisor was not liable under a *respondeat superior* theory for constitutional torts committed by a subordinate. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988). And a merely negligent failure to intervene was not enough to show discrimination that violated the Equal Protection Clause. See *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005) (supervisor would be liable if plaintiffs showed he was "deliberately indifferent in facilitating" discriminatory termination).

A reasonable official in Haessig's position would have known that her alleged conduct was unconstitutional. See *Hernandez v. Foster*, 657 F.3d 463, 473–74 (7th Cir. 2011) ("A right is clearly established when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right.") (internal quotation marks and modifications omitted). Accepting Locke's version of the facts, Haessig was more than merely negligent. She failed to intervene or investigate in response to Locke's complaint, and she then threatened to retaliate against him for complaining of harassment.

The facts of *Valentine* are similar to this case and show that Haessig was on notice her alleged conduct was unconstitutional. In *Valentine*, the plaintiff, a state employee, complained several times to her supervisor that a co-worker was sexually harassing her by making profane comments about her body, making obscene gestures to her, and caressing her arm and shoulder. Each time the plaintiff complained, the supervisor told the harassing co-worker to stop, yet the harassment continued. The court held that a "reasonable juror could find under these circumstances that [the supervisor's] response was obviously inadequate, and [he] was aware that to prevent the harassment he would have to take more severe action." *Valentine*, 452 F.3d at 684. The supervisor further told the plaintiff that she was making trouble by reporting the harassment up the chain of command. *Id*. The court concluded that a jury could infer that the supervisor had "consciously chosen not to protect" the plaintiff and that there was a material question of fact as to whether the supervisor had intentionally discriminated against the plaintiff, precluding summary judgment. *Id*.

Locke alleges that Haessig did even less in response to Locke's complaint of harassment than the supervisor in *Valentine*. The supervisor in *Valentine* told the harasser to stop each time the plaintiff complained. Even then we found that a jury could infer the supervisor was intentionally discriminating by failing to do more when that response was clearly inadequate. In contrast, we must assume Haessig did nothing to intervene to stop the harassment in response to Locke's complaint. While she reported the complaint to her supervisor, she failed to follow up with Locke as her supervisor directed and never spoke to Locke about the complaint. Locke presents further evidence that Haessig threat-

ened to retaliate against him for making the complaint by threatening to keep his ankle monitor on for the duration of his parole. As in *Valentine*, a jury could infer that Haessig had "consciously chosen not to protect" Locke from the sexual harassment and on that basis hold Haessig liable for intentional sex discrimination. See *id*. at 684.

After *Valentine*, it should have been clear to a reasonable officer that Haessig's alleged conduct was unlawful in this situation. See *Pearson*, 555 U.S. at 231; *Foster*, 657 F.3d at 473–74. Haessig cannot claim the protection of qualified immunity on the ground that she had no notice that her actions were unlawful.

B.  *Constitutional Violation Under Current Law*

Haessig could still be entitled to qualified immunity if the undisputed facts show that her conduct violates no constitutional right under current law. In other words, if developments in constitutional law since 2008 mean that Haessig's conduct did not violate any constitutional right, she would be entitled to summary judgment even if her conduct was unlawful under prevailing law in 2008. Haessig contends that her conduct violated no constitutional right because the facts show that she did not have the intent to discriminate that *Ashcroft v. Iqbal*, decided in 2009, now requires for supervisory liability for constitutional violations. 556 U.S. 662, 676–77 (2009).

In *Iqbal*, the complaint alleged in relevant part that the Attorney General and Director of the FBI adopted an unconstitutional policy subjecting thousands of Arab Muslim men to harsh conditions of confinement in the wake of the September 11, 2001 attacks because of their race, religion, or na-

tional origin. *Id.* at 667–69. The plaintiff brought his claim of unconstitutional discrimination as a *Bivens* action, the federal analog to suits brought against state officials under § 1983. See *Iqbal*, 556 U.S. at 675–76, citing *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006); see generally *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). The plaintiff argued that the defendants could be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria." *Iqbal*, 556 U.S. at 677.

The Supreme Court rejected the view that a supervisor could violate the Equal Protection Clause because of "mere knowledge of his subordinate's discriminatory purpose." *Id*. For constitutional violations under § 1983 or *Bivens*, a government official "is only liable for his or her own misconduct." *Id*. This means that a plaintiff who sues a supervisor must show the state of mind when the underlying constitutional violation requires a state of mind for liability. *Id*. at 676; see also *Barkes v. First Correctional Medical, Inc*., 766 F.3d 307, 319 (3rd Cir. 2014) ("[U]nder *Iqbal*, the level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged."), *rev'd on other grounds sub nom. Taylor v. Barkes*, No. 14-939, 575 U.S. — (June 1, 2015); *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) ("The Court in *Iqbal* explained that the factors necessary to establish a § 1983 violation depend upon the constitutional provision at issue, including the state of mind required to establish a violation of that provision.").

For discrimination claims like those at issue in *Iqbal* and here, where the state of mind of purposeful discrimination is an element of the violation, a supervisor is liable only if she had the specific intent to discriminate. *Iqbal*, 556 U.S. at 676.

For these claims, the plaintiff must show "more than 'intent as volition or intent as awareness of consequences.'" *Id.*, citing *Personnel Administrator v. Feeney*, 442 U.S. 256, 279 (1979). The supervisor is liable for undertaking a course of action only because of, not merely in spite of, the action's adverse effects upon an identifiable group. *Id.*, citing *Feeney*, 442 U.S. at 279.

Although *Iqbal* involved a claim of invidious discrimination, the Court's discussion shaped the law of supervisory liability for constitutional violations more generally. Before *Iqbal*, most circuits required that a supervisor act (or fail to act) with the state of mind of deliberate indifference to be liable, no matter the underlying constitutional violation. William N. Evans, *Supervisory Liability in the Fallout of Iqbal*, 65 Syracuse L. Rev. 103, 117–18 & n.41 (2014) (collecting cases). The deliberate indifference test required knowledge of the subordinate's misconduct and deliberate indifference to or tacit authorization of the misconduct. *Id*. at 117; see also *Jones*, 856 F.2d at 992 ("The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."). Our pre-*Iqbal* precedents on some discrimination claims seemed to allow a plaintiff to recover for a supervisor's deliberate indifference to a subordinate's purposeful discrimination. *Grindle*, 599 F.3d at 588 (discussing pre-*Iqbal* precedents for supervisory liability in this circuit), citing *Nanda*, 412 F.3d at 842 (holding that a supervisor would not be entitled to qualified immunity if the facts showed the supervisor "was deliberately indifferent in facilitating [his subordinate's] discriminatory termination").

However, our precedents on sexual harassment claims, a subset of discrimination claims, have focused on requiring intentional gender discrimination as an element of a claim against a supervisor. In our first case discussing a sexual harassment claim brought against a state or local official under the Equal Protection Clause, we said "the ultimate inquiry is whether the sexual harassment constitutes intentional discrimination." *Bohen*, 799 F.2d at 1187. We explained in regard to supervisory liability that "a plaintiff can make an ultimate showing of sex discrimination either by showing that sexual harassment that is attributable to the employer under § 1983 amounted to intentional sex discrimination or by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination." *Id.*, citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).

Decades later, in *Valentine*, we repeated the same standard, saying that a jury could infer that the supervisor had "consciously chosen not to protect" the plaintiff from the harassment so there was "a material question of fact as to whether [the supervisor] intentionally discriminated against [the plaintiff]." 452 F.3d at 684. These cases made clear that a supervisor was liable only if the ultimate trier of fact found that the supervisor intended to discriminate. But a reasonable jury could infer—though it would not be required to infer—the specific intent to discriminate from evidence that a supervisor knew about the harassment and chose not to intervene, so evidence of that nature was sufficient to survive summary judgment.

After *Iqbal*, we re-examined the state of mind required for supervisory liability for sexual harassment in *T.E. v. Grindle*,

599 F.3d 583 (7th Cir. 2010). In *Grindle*, the plaintiffs sued a school principal for her response to complaints that a band teacher was sexually harassing students at the school. After receiving a school counselor's reports of inappropriate touching, the principal interviewed the complaining students, spoke with their parents and the school's social worker, and wrote an incident report. The plaintiffs alleged that the principal soft-pedaled the investigation and response and discounted the complaints of serious harassment as an overreaction to the teacher tapping students' knees to keep time. The principal also told the harasser of the complaints and directed him to avoid making physical contact with students and to refrain from comments regarding students' appearance. The principal received other complaints about the teacher but addressed the problem as a teaching-methods issue rather than sexual harassment. *Id.* at 585–87.

We affirmed the district court's denial of the principal's motion for summary judgment based on qualified immunity. We acknowledged that after *Iqbal* a plaintiff must show "that the supervisor possessed the requisite discriminatory intent." *Id.* at 588 (internal citation omitted). We concluded, however, that the plaintiffs' evidence would

> allow a jury to conclude that [the principal] knew about [the teacher's] abuse of the girls and deliberately helped cover it up by misleading the girls' parents, the superintendent, and other administrators. From this evidence, a jury could reasonably infer—though it would not be required to infer—that [the principal] also had a purpose of discriminating against the girls based on their gender. If [the principal]

> wishes to argue that she merely wanted to avoid a scandal or that she would have taken similar steps to conceal abuse if boys had been the victims, she can present those arguments to the jury, but such suggestions do not mean that she is entitled to judgment as a matter of law. … [A] jury could conclude that by attempting to convert claims about sexual abuse by [the teacher] into complaints about teaching methods, [the principal] treated the girls' complaints differently because of their sex.

*Id*. at 589 (internal citations omitted).

Haessig argues that *Iqbal* and *Grindle* together mean that there is a constitutional difference between action and inaction—that purposeful discrimination may be inferred from the former but not the latter. She contends the district court erred as a matter of law in holding that a jury could find Haessig liable for an equal protection violation for purposefully ignoring Locke's complaint of harassment.[3]

---

[3] The district court's opinion was not entirely clear about the legal standard it applied to analyze Haessig's liability. Parts of the opinion seem to use the "deliberate indifference" standard for intent that *Grindle* disavowed after *Iqbal*. Some confusion is understandable because Haessig's summary judgment brief in the district court said that Locke could survive summary judgment if he showed that she "acted with the requisite culpable state of mind, i.e. deliberate indifference." Locke argues that Haessig's objection to the district court ruling is barred by invited error. See *Int'l Travelers Cheque Co. v. BankAmerica Corp.*, 660 F.2d 215, 224 (7th Cir. 1981) ("It is well settled law that a party cannot complain of errors which it has … invited [or] induced the court to make."). Because we affirm the district court even under the discriminatory intent

We have doubts about this argument. For one, there is little support in these cases for a distinction between action and inaction. Haessig points us to the Supreme Court's statement that purposeful discrimination "involves a decisionmaker's undertaking a course of action because of … the action's adverse effects upon an identifiable group." *Iqbal*, 556 U.S at 676–77 (internal quotation marks and modifications omitted). Haessig seizes on one phrase, "course of action," as implying that a supervisor who takes no action cannot, as a matter of law, intend discrimination. We reject such an expansive reading of *Iqbal*.

Haessig's argument conflicts with the principle that a supervisor could be liable for ignoring complaints from one identifiable group while acting on similar complaints from those of another group. See *Nabozny v. Podlesny*, 92 F.3d at 454–56 (reversing summary judgment on equal protection claim; school officials ignored male plaintiff's complaints of harassment but acted on female students' harassment complaints); see also *Bohen v. City of East Chicago*, 799 F.2d at 1190 (Posner, J., concurring) ("The chief of the fire department was aware of the harassment, which was frequent rather than isolated and in which at least one supervisory employee was implicated; yet he did nothing. It was as if the chief knew that his men were systematically refusing to put out fires in homes owned by blacks, yet did nothing to correct the situation."). Short perhaps only of a confession of intentional discrimination, selective inaction can be strong evidence of discriminatory intent.

---

standard that Haessig argues on appeal, we do not reach the issue of invited error.

In any event, Locke has provided evidence that tends to show that Haessig's response was more than mere inaction. A reasonable jury could infer that Haessig had the requisite intent to discriminate because she threatened to retaliate against Locke after he complained of sexual harassment. See *Grindle*, 599 F.3d at 589 (evidence that principal failed to intervene and downplayed seriousness of the harassment was enough to allow a reasonable jury to infer intent to discriminate); see also *Jackson v. Birmingham Board of Education*, 544 U.S. 167, 173–174 (2005) (interpreting Title IX prohibition of "discrimination" "on the basis of sex" to include retaliation and holding: "Retaliation is, by definition, an intentional act."). Haessig was irritated with Locke after he made the complaint and told him that he would not be released from his ankle monitor until he was discharged from parole. Agent Schwartz acknowledged to Locke that Haessig's actions were retaliation for reporting the sexual harassment. This evidence of retaliation, especially when combined with the evidence of a failure to intervene or investigate, is enough to defeat summary judgment on the qualified immunity defense.[4]

Haessig responds by arguing that retaliation simply cannot support an inference of discriminatory intent. She cites *Boyd v. Illinois State Police*, 384 F.3d 888 (7th Cir. 2004), but *Boyd* denied a different sort of claim and should not be read

---

[4] The admissibility of Schwartz's statement is not within the limited scope of our appellate jurisdiction on this interlocutory appeal. See *Whitlock*, 682 F.3d at 575 ("Questions of admissibility are indeed legal questions; but they are not the sort of legal questions that are sufficiently separable from the merits so as to provide us with jurisdiction in a collateral-order appeal.").

so broadly. In *Boyd*, the plaintiff brought an equal protection claim against his employer for withholding a raise because the plaintiff was suing the employer for Title VII violations. We specifically noted that the plaintiff had not asserted that his employer "retaliated against him on the basis of a protected trait or because of his membership in a particular class, but only because of his participation in this litigation." *Id*. at 898. We held that this claim could be brought under Title VII or the First Amendment but not under the Equal Protection Clause. *Id*. We reaffirmed that the Equal Protection Clause "does not establish a general right to be free from retaliation." *Id*., quoting *Grossbaum v. Indianapolis-Marion County Building Auth.*, 100 F.3d 1287, 1296 n.8 (7th Cir. 1996).

In contrast, Locke is not asserting a general right to be free from retaliation, so *Boyd* has no bearing on his claim. Locke argues that Haessig retaliated against him because of a protected characteristic, his sex. See *Jackson*, 544 U.S. at 174 ("[R]etaliation is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination."). A reasonable jury could conclude from these facts that Haessig responded to his complaint with irritation and told him he would remain on an ankle monitor because of his sex—because he was a man rather than a woman complaining of sexual harassment. See *Nabozny*, 92 F.3d at 455–56.

Haessig may still argue to the jury that she "merely wanted to avoid a scandal," that she consistently failed to take action in responding to all parolee complaints, or that she would have had the same response to a woman who complained of sexual harassment. See *Grindle*, 599 F.3d at

589. But the availability of those arguments does not mean that Haessig is entitled to judgment as a matter of law. *Id*. Locke may submit his evidence to a jury and can prevail if he can convince the jury that Haessig treated Locke's complaint differently because he was a man complaining of sexual harassment. Locke does not need to prove that Haessig was motivated solely by his sex in the way that she responded to his complaint, but he must show that she chose her course of action at least in part because of his sex. See *id*., citing *Feeney*, 442 U.S. at 279.

For the foregoing reasons, we AFFIRM the district court's denial of summary judgment and REMAND for proceedings consistent with this opinion.